# WESTERN UNION TELEGRAPH COMPANY *v.* PENNSYLVANIA RAILROAD COMPANY *et al.*

## APPEAL FROM AND ON WRIT OF CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

Nos. 89, 199. Argued October 19, 20, 1904.—Decided December 12, 1904.

The act of Congress of July 24, 1866, 14 Stat. 221, Rev. Stat. §§ 5263 *et seq.*, giving telegraph companies the right to construct and operate their lines through, along and over the public domain, military or post roads and navigable waters of the United States, was a legitimate regulation of commercial intercourse by telegraph among the States and appropriate legislation to carry into execution the power of Congress over the postal service; it was merely an exercise of National power to withdraw such intercourse from state control and interference.

This court has already held in *Pensacola Telegraph Co.* v. *Western Union Tel. Co.*, 96 U. S. 1, and *Western Union Tel. Co.* v. *Ann Arbor Railroad Co.*, 178 U. S. 239, and now follows those decisions that the act of July 24, 1866, does not confer upon telegraph companies, the right to enter upon private property without the consent of the owner or grant them the right of eminent domain.

A railroad's right of way is property devoted to a public use and has often been called a highway, and as such is subject, to a certain extent, to state and Federal control but it is so far private property as to be entitled to the protection of the Constitution so that it can only be taken under the power of eminent domain; and a condition precedent to the exercise of the power of eminent domain is that the statute conferring it make provision for compensating the owner.

No statute of New Jersey makes railroad property subject to occupation by telegraph companies under the act of Congress of 1866.

THIS is a bill in equity filed in the Circuit Court of the District of New Jersey by the appellant against the appellee, the Pennsylvania Railroad Company, to prevent the latter from removing from various railroad companies' rights of way the telegraph lines of the appellant. The bill was filed in aid of a petition on the law side of the court, praying the court to issue its process or take such modes of procedure as might be

agreeable to the principles and usages of law, to determine the amount of compensation to be paid by appellant to appellee for the use of the right of way of the appellee, and its branches and connecting lines, to construct, maintain and operate a line of telegraph over and along such railways, subject to the conditions and provisions named in the act of Congress of July 24, 1866.   14 Stat. 221, c. 230; Rev. Stat. §§ 5263 *et seq.*

The construction of this act of Congress is the main question in the case.

The appellant, which we shall designate the Telegraph Company, contends that under certain acts of Congress the roads of the Railroad Company and all other railroads in the United States are made post roads, and that by the act of July 24, 1866, the Telegraph Company has the right to construct, maintain and operate lines of telegraph along said roads upon the payment of compensation to the Railroad Company.   In other words, the contention is that by the act of 1866 the Telegraph Company is given the power of eminent domain to acquire the right to occupy with its telegraph lines the rights of way of the Railroad Company.

A summary of the bill is as follows: The Telegraph Company is a New York corporation; the Railroad Company is a Pennsylvania corporation.   The New Jersey Railroad and Canal Company was incorporated under the laws of New Jersey and is the owner of a railroad extending from Jersey City in the State of New Jersey to the Delaware River at the city of Trenton in said State, with certain branches, which the bill describes. The Railroad Company is the owner of a line of railroad extending from the city of Philadelphia to the city of Pittsburgh in the State of Pennsylvania, and in possession and control of the railroads of the New Jersey Railroad and Canal Company in New Jersey, under a lease or leases for a period of nine hundred and ninety-nine years from the first of July, 1871.   By the laws of New Jersey the said railroads were created, and made and are now, public highways, and hence are subject to occupation and use of telegraph companies

under the provisions and conditions of the act of Congress of July 24, 1866.

The Telegraph Company was organized in 1851, and began then to construct and has constructed and acquired a continuous system of telegraph lines, which extends through all of the States and Territories of the United States and connects with telegraph lines in the Dominion of Canada, and with lines also in the Republic of Mexico and South American Republics, and with and by submarine cables with the systems of all telegraph lines of foreign countries.

The system operated directly by the Telegraph Company consists of over 192,000 miles of poles and cables, and over 900,000 miles of wire, and that an important part of the system and connected with its main office in New York City, and with other lines leading to the important cities of the West, is the lines of telegraph over and along the lines of railway operated by the Railroad Company, connecting Jersey City with Philadelphia, and connecting with other lines of the system.

The lines of telegraph along the railways in New Jersey were originally constructed by the American Telegraph Company, a corporation of the State of New Jersey, with the consent of or under contracts and arrangement with the railway company, then owning the said lines of railway, and were constructed more than forty years ago, and since the twentieth of September, 1881, the telegraph lines over the right of way of said railroads have been maintained and operated and compensation paid therefor under the provisions of a contract between the Telegraph Company and the Railroad Company. The contract granted to the Telegraph Company the right to place, maintain and use upon the line of the right of way of the Railroad Company, and of the railroads owned, operated or leased by it, a single line of telegraph poles (in certain cases two were authorized), with the privilege of erecting and maintaining thereon such number of wires as the Telegraph Company might from time to time elect, said lines

to be located and placed under the direction of an officer of the Railroad Company.

The Telegraph Company agreed to pay annually for the privileges granted the sum of $75,000, in monthly installments of $6,250, and to deliver to the Railroad Company certain poles and wire, which were then on certain of their roads. The Telegraph Company also agreed to transmit the messages of the Railroad Company at a compensation which was stated.

The provisions for the termination of the agreement and in the event of its termination are as follows:

"Thirteenth. This agreement is to continue in force for and during the term of twenty years from its date, and shall be binding upon the respective companies, their sucessors and assigns, and neither party shall have the right to assign the whole, or any part hereof, without the consent of the other, given in writing.

\* \* \* \* \* \* \* \*

"Fifteenth. If any monthly payment herein provided for be not made within sixty days after it shall have become due, and shall have been demanded by written notice, delivered to the treasurer, or an executive officer of the party in default, or if any other covenant herein made shall not, after sixty days' written notice of default and demand made, by either party in the manner herein provided, be fulfilled by the other party, the contract may, at the option of the party demanding such fulfilment, be rescinded, and such rescission shall not relieve the party in default from liability for any amount due, or for damages for non-fulfillment of such covenant or of any other covenant.

"Sixteenth. If no new agreement be made by the parties hereto, the Telegraph Company shall, at the termination of this contract, or at any time hereafter, upon receiving written notice from the Railroad Company, remove within six months from the receipt of said notice all of its poles and wires and leave the property of the Railroad Company in good condi-

tion and free from the encumbrance thereof to the satisfaction of the general manager, or other proper officer of the Railroad Company, and if not so removed the Railroad Company may remove them at the expense of the Telegraph Company: *Provided, however,* That the payment agreed to be made by the Telegraph Company to the Railroad Company in the sixth clause hereof, and by the Railroad Company in the eighth clause, shall not apply to the said six months, the companies respectively hereby expressly agreeing to waive the same."

The agreement contains the following provision:

"Any easement or right of way heretofore acquired by the Telegraph Company upon any of the roads embraced in this agreement, either directly by contract or by assignment of contracts or agreements made by other companies with the Railroad Company, or with any of the companies whose roads or property are embraced in the schedule hereto attached, is hereby relinquished and abandoned, and the rights and easements of the Telegraph Company upon the right of way of said Railroad Company shall be such only as are granted by this agreement, and shall cease with its termination."

The agreement was carried out and the payments made as provided, the last being made on the twentieth of June, 1902.

On the fourteenth of May, 1902, the Railroad Company notified the Telegraph Company in writing to remove its poles, wires and other property from the right of way and property of the Railroad Company and of the other companies mentioned in the agreement, within six months from the first day of June, 1902. The notice stated that in default of compliance the Railroad Company would itself cause such poles, wires and other property of the Telegraph Company to be removed from the right of way at the expense of the latter company.

It is alleged in the bill that, by reason of the facts set forth, and by reason of the receipt of payments after the twenty-first of September, 1901, and after the notice of removal, the agreement was continued in force, and that the Railroad Company had no right, notwithstanding the notice of May 14,

1902, to remove or cause to be removed from the line of its railways the poles, wires and telegraph property of the Telegraph Company at the end of six months from the first day of June, 1902.

It is also alleged that the lines of telegraph have been maintained and operated over the lines of railway without interfering with the ordinary use and operation thereof or the ordinary travel thereon, and, as now located, maintained and operated, can be continued so as not to interfere with the future operation and maintenance of the said railways or the ordinary travel upon them, subject only to such slight changes of some of the poles of said lines as may be incident to the construction of additional tracks upon said right of way or shifting the tracks already existing on said railways.

May 20, 1902, the president and general manager of the Telegraph Company, in a letter addressed to the president of the Railroad Company, acknowledged receipt of the notice of removal of May 14, and stated that he understood that negotiations had been in progress between the officers of the respective companies for a renewal of the contract of September 20, 1881, and declared that he would be glad to take up the matter actively, either in New York or in Philadelphia, at the convenience of the president of the Railroad Company. The following day the president of the Railroad Company replied, stating that none of the companies named "desires to renew or extend its contract with the Western Union Telegraph Company," and that the contract between the companies had terminated under its terms on the twentieth of September, 1901, and the notice to the Telegraph Company to remove its poles had been given in accordance with the provisions of the contract. A willingness to discuss any temporary arrangement which might be necessary during the time allowed for the removal of the poles of the Telegraph Company was expressed. A somewhat lengthy reply was made, in which the Telegraph Company claimed that since some of the contracts referred to by the Railroad Company were per-

petual in their terms, or ran during the life of the parties, they
could not be terminated by one party without the consent of
the other; asserted a right, under the laws of Congress and the
laws and constitution of the State of Pennsylvania, to main-
tain and operate its lines of telegraph on the Railroad Com-
pany's roads, subject only, at most, to make a fair and rea-
sonable compensation for such right, which it offered to pay,
and requested, if the Railroad Company declined to contract
further with it, a meeting for the purpose of agreeing upon the
amount of such compensation, or to submit the matter to
arbitration. The Railroad Company replied that the meet-
ing requested would be useless, as the Telegraph Company
asserted rights upon the lines of the Railroad Company which
could not be conceded. It was stated in the reply that the
Railroad Company had agreed and contracted with the Postal
Telegraph Cable Company covering the railroads included in
the contract with the Telegraph Company, and that the Postal
Telegraph Cable Company would immediately commence
transacting a commercial telegraph business at the stations
of the Railroad Company. The Railroad Company offered to
permit the Telegraph Company to do business at the railroad
stations until September 30, next ensuing (1902); and for the
purpose of avoiding unnecessary loss to the Telegraph Com-
pany, incident to the removal of its poles, the Railroad Com-
pany expressed a willingness to purchase, at a fair valuation,
such of the lines as it could make use of.

It is alleged in the bill that the notice given to the Tele-
graph Company to remove its poles from the railroads, and
the refusal of the Railroad Company to negotiate further with
the Telegraph Company, was not induced from any compul-
sion or necessity to use the space occupied by the telegraph
lines; but that the purpose of the Railroad Company is to place
upon the lines of railway telegraph lines to be owned or used
by another telegraph company, and it is alleged that the lines
of the Telegraph Company will not interfere with the ordinary
travel and use of the railways.

The directors of the Telegraph Company accepted the act of July 24, 1866, and filed an acceptance with the Postmaster General of the United States June 8, 1867.

The acts of Congress hereinafter mentioned and set out are referred to in the bill, and a full compliance therewith alleged, whereby, it is further alleged, the Telegraph Company became and is entitled to maintain its lines on the railroads of the Railroad Company upon paying just compensation, the payment of which was offered. The prayer is that the court order and decree the amount of compensation to be paid by the Telegraph Company, or, if the court order compensation to be ascertained at law, it then be decreed that upon payment of such compensation a perpetual injunction issue.

A preliminary injunction was ordered. 120 Fed. Rep. 981. It was reversed by the Circuit Court of Appeals. 123 Fed. Rep. 33.

A controversy ensued upon the form of the decree. The Circuit Court of Appeals simply reversed the order of the Circuit Court granting a preliminary injunction. The Telegraph Company moved that the decree be modified so as to direct the dismissal of the bill. The motion was refused, and the Telegraph Company took an appeal to this court. Subsequently the Circuit Court *sua sponte* entered an order dismissing the bill; and the Telegraph Company appealed therefrom to the Circuit Court of Appeals. The case was then removed to this court by certiorari.

*Mr. John F. Dillon, Mr. Rush Taggart* and *Mr. Henry D. Estabrook,* with whom *Mr. Richard Vliet Lindabury* was on the brief, for appellant and petitioner.

The Telegraph Company, having in 1867 accepted the conditions of the act of 1866, and faithfully performed all the obligations imposed thereby, has paid and is paying to the Federal Government a full and continuing consideration for the rights granted by Congress under those acts, and has thereby become not only a special and peculiar agency of the

Government, but the Government, under its option of purchase, has acquired a vested interest in the property and franchises of petitioner more real and tangible than its interest or property in the public mails committed to its charge. 14 Stat. 221; Rev. Stat. §§ 5263 *et seq.* The Federal Government has a property in the mail. *Searight* v. *Stokes,* 3 How. 151; *In re Debs,* 158 U. S. 583. See also act of June 10, 1872.

The Government of the United States has jurisdiction over every foot of soil within its territory, and within its enumerated powers has full attributes of sovereignty within the limits of those powers, among which are the power over interstate commerce and the power to establish post offices and post roads. *Western Un. Tel. Co.* v. *James,* 162 U. S. 650; *In re Debs,* 158 U. S. 564; *Gibbons* v. *Ogden,* 9 Wheat. 1; *L. S. & Mich. So. R. R.* v. *Ohio,* 173 U. S. 285.

To trace historically the evolution of the doctrine in question, see 2 Story Const., Ch. 18; 1 Kent's Com. 267, and the portions of Elliott's Debates therein referred to; *United States* v. *Kochersperger,* No. 15,541, Fed. Cases; the various cases growing out of the abandonment of the Cumberland Road, particularly *Searight* v. *Stokes,* 3 How. 150, 1845; *Neil* v. *Ohio,* 3 How. 720; *Achison* v. *Huddleson,* 12 How. 293.

Federal sovereignty can appropriate property within a State without the consent or acquiescence of the State. *Trombley* v. *Humphry,* 23 Michigan, 471; Cooley's Const. Lim. cited in *Kohl* v. *United States,* 91 U. S. 367.

When the highways of a State are, by act of Congress, established post roads of the United States, they become part of the postal equipment of the Federal Government and subject to its paramount authority for postal and military purposes.

The constitutionality of the act of 1866 has never been questioned. It has uniformly been held that under this act, telegraph companies accepting its provisions have the right to occupy with their lines of telegraph the streets of a city and the roads of a State which by act of Congress have been

established post roads of the United States. *Postal Tel. & Cable Co.* v. *Oregon Short Line R. R. Co.*, 114 Fed. Rep. 787; *W. U. Tel. Co.* v. *Texas*, 105 U. S. 460; *Western Union Tel. Co.* v. *Massachusetts*, 125 U. S. 554.

If the highways, owned and operated by a State, are subject to the paramount authority of Congress for postal and military uses, could anything less be said of a highway, such as a turnpike, authorized by the State, but operated by a corporate agency created by the State. *West. Un. Tel. Co.* v. *City of New York*, 38 Fed. Rep. 552; *St. Louis* v. *Western Union Tel. Co.*, 148 U. S. 92; *United States* v. *Union Pac. Ry.*, 160 U. S. 1; *Postal Tel. Co.* v. *Oregon Short Line R. R.*, 65 Pac. Rep. 735; *Hewett, et al.,* v. *Western Union Tel. Co.*, 4 Mackey, 424.

The primary use of a highway is for the purpose of travel, but the occupation of the highway by telegraph lines, if so maintained and operated as not to interfere with the primary use, is not only permissible, but, thus limited, has been held not to constitute an additional servitude. A highway is created not alone for the purpose of travel, but for commerce and the transmission of intelligence. *Julia Building Association* v. *Bell Tel.*, 88 Missouri, 258; *Cater* v. *Northwestern Tel. Ex. Co.*, 60 Minnesota, 593; *Magee* v. *Overshiner*, 40 L. R. A. 370; *People* v. *Eaton*, 100 Michigan, 208; *Pierce* v. *Drew*, 136 Massachusetts, 75; *Hershfield* v. *Rocky Mt. Bell Tel. Co.*, 2 Montana, 103.

A post, etymologically defined, is a mode of conveying written or *unwritten* intelligence. According to this the telegraph is a "post." *United States* v. *Kochersperger*, 26 Fed. Cas. 803.

A railroad is a highway, not simply *sub modo*, but intrinsically and *per se*, in the same category precisely as roads, streets, alleys, turnpikes, plank roads, tramways, bridges, ferries, canals and navigable rivers. *Olcott* v. *Supervisors*, 16 Wall. 678; *In re Debs*, 158 U. S. 564; *Monongahela N. Co.* v. *United States*, 148 U. S. 312; *Cherokee Nation* v. *So. Kansas R. R.*,

135 U. S. 641, 657; *L. S. & M. S. R. R.* v. *Ohio*, 173 U. S. 285; *Smyth* v. *Ames*, 169 U. S. 466; *Trunick* v. *Smith*, 63 Pa. St. 18; *California* v. *Pacific R. R. Co.*, 127 U. S. 1, 39; *W. M. & P. R. R.* v. *Jacobson*, 179 U. S. 287, 296; *L. & N. R. R. Co.* v. *Kentucky*, 161 U. S. 696; *Mich. Tel. Co.* v. *City of Charlotte*, 93 Fed. Rep. 11. And taxes may be imposed for their construction and maintenance. *Railroad Company* v. *County of Otoe*, 16 Wall. 667, 673; *Queensbury* v. *Culver*, 19 Wall. 83, 91; *People* v. *Flagg*, 46 N. Y. 401.

The primary purpose of every highway is public travel, traffic, commerce, communication. But the manner of use within the range of physical possibility is for the legislature to determine. It is because railroads are highways that Congress is empowered to establish them as post and military roads of the United States.

The power of Congress to establish the railroads of the United States as military and post roads is not a dormant power, but has been asserted and enforced by the Federal Government from the day the first railroad company was chartered. It has frequently been exercised as to railway bridges. 17 Stat. 99, 120, 160, 379. See also 5 Stat. 283; 10 Stat. 255; 12 Stat. 334; 14 Stat. 66; 17 Stat. 308, where in the case of such highways as the waters of the United States, canals and plank roads, Congress declares them to be post roads "during the time the mail is carried thereon." Is not the omission of this qualification in the case of railroads somewhat significant?

By the act of 1866, and correlated acts, Congress declared a policy and a purpose, that to encourage and facilitate intercommunication among the people, the companies operating the railroads and telegraphs of the United States should be mutually accommodating and coöperative, and should, so far as practicable, construct their lines of railroad and telegraph along the same rights of way. This policy is not only manifest from the title and context of the act of 1866, but from its history and the debates in Congress prior to its passage. This

policy has been discovered and declared by the courts, and numerous States have extended the policy by legislative enactment to include the telephone.   Not only so, but through the dictates of self-interest and mutual accommodation, railroad and telegraph companies, from the earliest times, have under contract and agreement, operated side by side, so that today there is not, nor has there ever been, a railroad in the United States, over and along which telegraph lines have not been constructed, maintained and operated.   Cong. Globe, Pt. IV, 1st Sess. 39th Cong., pp. 3480–3490; *W. U. Tel. Co.* v. *Massachusetts*, 125 U. S. 530; *United States* v. *Union Pac. Ry. Co.*, 160 U. S. 1, 41, 49; *Tel. Co.* v. *Texas*, 105 U. S. 460; *Postal Tel. Cable Co.* v. *Oregon Short Line*, 114 Fed. Rep. 787; *Postal Tel. Cable Co.* v. *Southern Ry. Co.*, 89 Fed. Rep. 190; *Postal Tel. Cable Co.* v. *Oregon Short Line*, 65 Pac. Rep. 735; *West. Un. Tel. Co.* v. *B. & S. W. Ry. Co.*, 3 McCrary, 130; *West. Un. Tel. Co.* v. *B. & O. Tel. Co.*, 19 Fed. Rep. 660; *Southern Bell Tel. Co.* v. *Richmond*, 78 Fed. Rep. 858.

Not only so, but the statutes of many States extend the right to occupy the highways of the State, including the highways called railroads, to telephone companies—this court having limited the application of the act of July 24, 1866, to telegraph companies proper.   *New Orleans, M. & T. R. R. Co.* v. *S. & A. T. Co.*, 53 Alabama, 211; Colorado: *Union Pac. R. Co.* v. *Colo. Postal Tel. Cable Co.*, 69 Pac. Rep. 564; Georgia: *S. F. & W. Ry. Co.* v. *Postal Tel. Co.*, 38 S. E. Rep. 353; Idaho: *Postal Tel. Co.* v. *O. St. Line Ry. Co.*, 104 Fed. Rep. 623; Illinois: *St. L. & C. R. R. Co.* v. *Postal Tel. Co.*, 173 Illinois, 508; Kentucky: *Postal Tel. Co.* v. *Mobile & O. R. Co.*, 54 S. W. Rep. 727; Louisiana: *Postal Tel. Co.* v. *M., L. & T. R. R. & S. S. Co.*, 21 So. Rep. 183; Mississippi: *Mobile & O. R. Co.* v. *Postal Tel. Co.*, 26 So. Rep. 370; North Carolina: *Phillips* v. *Postal Tel. Co.*, 41 S. E. Rep. 1022; Tennessee: *Mobile & O. Ry. Co.* v. *Postal Tel. Co.*, 41 L. R. A. 403; Texas: *T. & N. O. Ry. Co.* v. *Postal Tel. Co.*, 52 S. W. Rep. 108; Virginia: *Postal Tel. Co.* v. *Farmville & P. R. Co.*, 32 S. E. Rep. 468; Utah: *Postal*

*Tel. Co.* v. *Oregon Short Line,* 65 Pac. Rep. 735; Ohio: R. S. §§ 3454 *et seq.*

By the act of 1866, the Western Union Telegraph Company, having accepted its provisions, was in express terms granted, among other things, "the right to construct, maintain and operate lines of telegraph over and along" the railroads of the defendant railroad company, provided only that its lines be so constructed and maintained as not to interfere with the ordinary travel on the railroads.

The right granted to the Western Union Telegraph Company by the act of 1866, is simply of an easement of use, in an easement, yielding at all times to the necessities of the paramount use, and limited at all times to the non-interference with the primary uses of the railroad company.

A right granted in such manner is not unusual, see cases cited *supra.*

As to whether Congress, under its constitutional powers over the highways of the nation, as military and post roads, may appropriate the use of such post roads for the construction and operation of postal telegraph lines owned by it, or by one of its agencies, so long as the same shall not interfere with the ordinary travel on such military and post roads, without making compensation, either to the owners of the post roads or to the owners of reversionary interests therein, see *Pittsburgh & W. E. Pass. Ry.* v. *Point Bridge Co.,* 165 Pa. St. 37; *Stockton* v. *B. & N. Y. R. R. Co.,* 32 Fed. Rep. 9; *Scranton* v. *Wheeler,* 57 Fed. Rep. 803; *S. C.,* 179 U. S. 141, and authorities cited; *Hawkins Point Light House Case,* 39 Fed. Rep. 77; *S. C.,* 155 U. S. 102; *Gibson* v. *United States,* 166 U. S. 269; *Hewett* v. *W. U. Tel. Co.,* 4 Mackey, 424; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 324; *Hill* v. *United States,* 149 U. S. 593.

As to the public character of a railway, see act incorporating N. J. R. R. and Transportation Company, by the legislature of New Jersey, March 7, 1832; *Civil Rights Cases,* 109 U. S. 3; *Wisconsin &c. R. R. Co.* v. *Jacobson,* 179 U. S. 287, 296; *Lake*

*Superior &c. R. R. Co.,* 93 U. S. 442; § 21 Penna. R. R. Co.
Charter, Pamphlet Laws of Pennsylvania, 1846, p. 312; *Trunick*
v. *Smith,* 63 Pa. St. 18; *People's Telephone* v. *President &c.,*
199 Pa. St. 411. For decisions *pro* and *con* as to whether a
telegraph line is an additional servitude, see *Nichol* v. *Tele-
graph Co.,* 62 N. J. L. 733, as reported in 7 Am. Elec. Cas.
277, with note by Edw. Q. Keasbey.

If a telegraph company, accepting the obligations of the
act of 1866, in attempting to avail itself of the rights and
privileges granted it by said act in public and such *quasi*-
public property as the military and post roads of the United
States, finds it necessary to appropriate to its use private
property involved with the public and *quasi*-public property,
the grant made by Congress will not be declared void as tran-
scending the constitutional powers of Congress, but the Con-
stitution itself will be read into the act and the act interpreted
in connection therewith and the courts will provide the court
machinery necessary to determine judicially the amount of
just compensation to be paid therefor.

The right to condemn may be exercised on the theory that
an implied right has been granted. 10 Am. & Eng. Ency.
of Law, 1054.

Statutes should be sustained rather than ignored. *Charles
River Bridge* v. *Warren Bridge,* 11 Pet. 420; *Fenton* v. *Hamp-
don,* 11 Moore's P. C. 360; Sutherland's Statutory Construc-
tion, §§ 295, 324, 332, 340, 341, 343, 344, 379, 382, 388.

The constitutional inhibition against taking private prop-
erty without just compensation, being negative, is self-execut-
ing, and is to be read into every law and statute where ap-
plicable. *In re Rugheimer,* 36 Fed. Rep. 369; *Hickman* v.
*City of Kansas,* 41 Am. St. Rep. 684, and note; *West. Un. Tel.
Co.* v. *Williams,* 8 L. R. A. 429. Compare *Neal* v. *Delaware,*
103 U. S. 370; *East St. Louis* v. *Amy,* 120 U. S. 600; *Kentucky
Railroad Tax Cases,* 115 U. S. 321, 334. Where a right is given
by law or statute, and no special machinery is provided for the
enforcement of the law, the courts will supply the machinery,

·either by adopting the machinery already in use or the machinery in vogue at common law, which, in cases of condemnation, was the writ *ad quod damnum,* which simply means that the amount of compensation to be paid to an owner for the appropriation of his private property to a public use shall be determined by a full jury. *Kohl* v. *United States,* 91 U. S. 367; *United States* v. *Jones,* 109 U. S. 513; *High Bridge Co.* v. *United States,* 69 Fed. Rep. 320; *Boom Co.* v. *Patterson,* 98 U. S. 403; *Dashiell* v. *Grosvenor,* 66 Fed. Rep. 338; *New York* v. *Pine,* 185 U. S. 93; *Galway* v. *Elevated Ry. Co.,* 128 N. Y. 132; *Shepard* v. *Elevated R. R. Co.,* 117 N. Y. 442; *Osborne* v. *Mo. Pac. Ry. Co.,* 147 U. S. 248; *McElroy* v. *Kansas City,* 21 Fed. Rep. 357; *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 645; *St. Paul &c. Ry. Co.* v. *W. U. T. Co.,* 118 Fed. Rep. 497. As to the writ *ad quod damnum,* see 2 Lewis Em. Dom. § 402; *Scudder* v. *T. D. F. Co.,* 1 Sax. Ch. (N. J.) 694; *Hooker* v. *New Haven & N. Co.,* 14 Connecticut, 146; *Jerome* v. *Ross,* 7 Johns. Ch. 315; *Wheelock* v. *Young,* 4 Wend. 650; *Stevens* v. *Middlesex County,* 12 Massachusetts, 466; *Bloodgood* v. *M. & H. R. R. Co.,* 18 Wend. 9; *Beekman* v. *S. & S. R. R. Co.,* 3 Paige Ch. 45; *Upshur County* v. *Rich,* 135 U. S. 467, 476.

· The act of 1866, necessarily implies that the beneficiary is vested with the power of eminent domain if, to avail itself of the rights granted, private property, incidentally involved with the specific property appropriated to its use, is also appropriated by it; otherwise the grant would fail. *Murphy* v. *Kingston &c. R. R. Co.,* 11 Ontario, 582, distinguished.

· No case involving the principal issue herein has ever been presented to this court. The *Pensacola* case and the *Ann Arbor* case, on this point are not only clearly *obiter,* but by no means justify the significance attributed to them.

While the principal issue has never been presented to this court lesser courts have construed the act of 1866 according to the principles contended for by the petitioner. *Postal Tel.-Cable Co.* v. *Oregon Short Line,* 114 Fed. Rep. 787; *Postal*

*Tel.-Cable Co.* v. *Southern R. R. Co.*, 89 Fed. Rep. 190; *Postal Tel.-Cable Co.* v. *Oregon Short Line*, 65 Pac. Rep. 735; *St. P., M. & M. R. R. Co.* v. *W. U. Tel. Co.* (C. C. A.), 118 Fed. Rep. 497. Cf. *St. Louis* v. *W. U. Tel. Co.*, 148 U. S. 92; *United States* v. *Union Pac. Ry. Co.*, 160 U. S. 1, 41; *Southern Bell Telephone Co.* v. *Richmond*, 78 Fed. Rep. 858; *Union Trust Co.* v. *A., T. & S. F. R. R. Co.* (New Mex.), 43 Pac. Rep. 701; *Mercantile Trust Co.* v. *Atlantic & Pac. R. R. Co.*, 63 Fed. Rep. 513; *W. U. Tel. Co.* v. *Los Angeles Electric Co.*, 76 Fed. Rep. 178; but see *contra, Postal Telegraph-Cable Co.* v. *C., C., C. & St. L. R. R. Co.*, 94 Fed. Rep. 234.

As to the construction of the act of 1866 and the weight to be given to its title and the discussion attending its passage, see *Holy Trinity Church* v. *United States*, 143 U. S. 457; *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 559; *Price* v. *Forrest*, 173 U. S. 410, 427.

While to ascertain the meaning of an act, the mere discussion in Congress is not given special weight in some of the decisions of this court, yet reference is frequently made to reports of committees for the purpose of confirming the construction adopted by the court. *Hepburn* v. *Griswold*, 8 Wall. 610; *Untermeyer* v. *Freund*, 50 Fed. Rep. 80; *Nor. Pac. Ry. Co.* v. *United States*, 36 Fed. Rep. 285; *United States* v. *Union Pac. R. R. Co.*, 37 Fed. Rep. 554; *Austin* v. *United States*, 25 C. Cl. 454; *United States* v. *Burr*, 159 U. S. 85.

*Mr. John G. Johnson* for appellees and respondents in Nos. 89 and 199 and defendant in error in No. 90.

Power to enter upon a railroad right of way by a telegraph company is not conferred in Pennsylvania by any general or special statute of that Commonwealth. Nor is the Pennsylvania Railroad a public highway within the meaning of the act of 1866. *Nor. Cent. Ry. Co.* v. *Commonwealth*, 90 Pennsylvania, 305; *Telephone Co.* v. *Turnpike Road*, 199 Pennsylvania, 415. As to the status of the railroad company's title see *Junction Railroad Co.* v. *Philadelphia*, 88 Pennsylvania,

427; *P. & R. R. R. Co.* v. *Hummell*, 44 Pennsylvania, 375; *Schuylkill Valley R. R. Co.* v. *Reading Paper Mills*, 149 Pennsylvania, 18; *Philadelphia* v. *Ward*, 174 Pennsylvania, 45; *Railway Co.* v. *Peet*, 152 Pennsylvania, 488.

It is thoroughly well settled by the Pennsylvania decisions that a right of way, appropriated to a corporation for a *quasi*-public use, cannot be appropriated by another *quasi*-public corporation, for its uses, by implication. Under these decisions, an unrestricted general right to appropriate is construed as not including the power to seize the property of another corporation. *Penna. R. R. Co.'s Appeal*, 93 Pa. St. 150; *Pittsburgh Junction R. R. Co.'s Appeal*, 122 Pa. St. 511; *Sharon Railway Co.'s Appeal*, 122 Pa. St. 533; *Groff's Appeal*, 128 Pa. St. 621; *Market Co.* v. *Railroad Co.*, 142 Pa. St. 580; *Pittsburgh Junction R. R. Co.* v. *Alleghany R. R. Co.*, 146 Pa. St. 297; *Perry County R. R. Co.* v. *Railroad Co.*, 150 Pa. St. 193; *Penna. R. R. Co.* v. *Schuylkill Nav. Co.*, 167 Pa. St. 576; *Youghiogheny Bridge Co.* v. *Railroad Co.*, 201 Pa. St. 457. It has recently been held in Pennsylvania that the right of eminent domain does not exist in telegraph companies. *Penna. Telephone Co.* v. *Hoover*, 24 Pa. Super. Ct. 96.

If the Atlantic and Ohio Telegraph Company possessed the right of condemnation claimed by the appellant, such right was exercisable only under a petition by it presented, and the proceedings in Pennsylvania were defective for want of the proper parties. Act of 1871, P. L. 516; P. L. 1868, 1191.

Had the Atlantic and Ohio Telegraph Company been made petitioner in the condemnation proceedings the Circuit Court would have had no jurisdiction because of a lack of diverse citizenship.

No right is conferred upon telegraph companies by the act of 1866 to appropriate any portion of the right of way of railroad companies. *Pensacola Tel. Co.* v. *West. Un. Tel. Co.*, 96 U. S. 1; *West. Un. Tel. Co.* v. *Ann Arbor R. R. Co.*, 178 U. S. 239; *St. Louis* v. *West. Un. Tel. Co.*, 148 U. S. 92; *West. Un. Tel. Co.* v. *Massachusetts*, 125 U. S. 530. *United States* v.

*Union Pac. Ry. Co.,* 160 U. S. 1; *St. Paul Railway Co.* v. *West. Un. Tel. Co.,* 118 Fed. Rep. 497, distinguished.

The Telegraph Company had no consent from the Railroad Company. The act of 1866 makes no provision for compensation and no procedure can be sustained under it. *Postal Tel. Cable Co.* v. *Cleveland Railway Co.,* 94 Fed. Rep. 234; *West. Un. Tel. Co.* v. *Ann Arbor R. R. Co.,* 90 Fed. Rep. 379.

The Railroad Company was entitled to the remedy given by its contract. If the Telegraph Company was entitled to appropriate part of its right of way, it was restricted, as were all other telegraph companies, to the right arising under such appropriation. It acquired no right before consummation of the condemnation proceedings, to an injunction against the enforcement of its contract.

As the Postal Telegraph-Cable Company had acquired a right antecedently to the alleged appropriation by the appellant, which rendered a location of additional wires and poles by the latter impossible, there was no right on the part of the latter to appropriate even if the act of 1866 allowed condemnation.

There was no waiver of the notice to remove given by the Railroad Company in May, 1902.

Mr. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

By an act of Congress, approved July 7, 1838, and by subsequent acts, March 3, 1853, 10 Stat. 249, 255, c. 146; sec. 3964, Rev. Stat., June 8, 1872, 17 Stat. 283, railroads within the limits of the United States were made post routes or roads.

By act of March 1, 1884, it is provided "that all public roads and highways, while kept up and maintained as such, are hereby declared to be post routes." 23 Stat. 3, c. 9.

The act of 1866 is as follows, 14 Stat. 221, c. 230:

"*Be it enacted by the Senate and House of Representatives of*

*the United States of America in Congress assembled,* That any telegraph company now organized, or which may hereafter be organized under the laws of any State in this Union, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under, or across the navigable streams of waters of the United States: *Provided,* That such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel of such military or post roads. And any of said companies shall have the right to take and use from such public lands the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance, and operation of said lines of telegraph, and may preëmpt and use such portion of the unoccupied public lands subject to preëmption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other.

"Sec. 2. *And be it further enacted,* That telegraphic communications between the several departments of the Government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster General.

"Sec. 3. *And be it further enacted,* That the rights and privileges hereby granted shall not be transferred by any company acting under this act to any other corporation, association, or person: *Provided, however,* That the United States may at any time after the expiration of five years from the date of the passage of this act, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects of any or all of said companies at an appraised value, to be ascer-

tained by five competent, disinterested persons, two of whom shall be selected by the Postmaster General of the United States, two by the company interested, and one by the four so previously selected.

"Sec. 4. *And be it further enacted,* That before any telegraph company shall exercise any of the powers or privileges conferred by this act, such company shall file their written acceptance with the Postmaster General of the restrictions and obligations required by this act."

The construction of this act is the fundamental question in the case. The Telegraph Company contends that the necessary implication from the provisions of the act is that telegraph companies may enter and appropriate for their poles and lines a part of the rights of way of railroads *in invitum* upon paying just compensation. In other words, that the act invests telegraph companies with the right of eminent domain. The Railroad Company denies this construction, and asserts that the act gives the consent of the Government to telegraph companies to construct lines through its public domain and over and along its military and post roads, which are not the property of private corporations, and across navigable streams and waters. The act gives no right, the Railroad Company contends, to appropriate private property; but is an exercise by Congress of the national power over interstate commerce to secure telegraph companies from "hostile state legislation or contracts violative of an announced public policy." In other words, the contention of the Railroad Company is, that after the act of 1866 was passed, it "became impossible for the States, by any legislation, to exclude telegraph companies from the post roads." The contentions of the parties are opposed, therefore, only as to the degree of right conferred by the act. It is asserted by one party, and unqualifiedly admitted by the other, that Congress has power to grant the power of eminent domain to corporations organized for national purposes, and the arguments of the parties are addressed only to the considerations which serve to deter-

mine the intention of Congress.  Both parties also claim authority for their respective contentions.

1. The act of 1866 came before this court for consideration over twenty-five years ago, in *Pensacola Telegraph Company* v. *Western Union Telegraph Co.*, 96 U. S. 1. . The language of the court defining the rights conferred by the act has recently been repeated and sanctioned in *Western Union Telegraph Company* v. *Ann Arbor R. R. Co.*, 178 U. S. 239.  In both cases the judgment of the court was adverse to the rights claimed under that act by the Telegraph Company in the case at bar. A review of those cases, therefore, and a consideration of the arguments directed against them and in support of them will constitute the most appropriate discussion of the questions now presented, and apply immediately to their solution the authority of this court.

In *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1, the legislature of Florida in 1866 granted to the Pensacola Telegraph Company "the sole and exclusive privilege and right" of maintaining and operating lines of telegraph through certain counties of the State. . In 1872 the property of the Alabama and Florida Railroad Company was transferred to the Pensacola and Louisville Railroad Company.  On the fourteenth of February, 1873, the legislature of Florida passed an act, which was amended in 1874, authorizing the last-named company to construct and maintain a telegraph line along its railroad, and to connect with lines in and out of the State.  This was in the territory embraced by the exclusive grant to the Pensacola Telegraph Company.

On the twenty-fourth of June, 1874, the Pensacola and Louisville Railroad Company granted to the Western Union Telegraph Company the right to erect a telegraph line upon its right of way, and transferred to it all the rights and privileges conferred by the acts of February, 1873, and 1874.  The Western Union Company immediately commenced the erection of the line, but before its completion the Pensacola Telegraph Company filed a bill to enjoin the work, on account

of the alleged exclusive right of that company under its charter. Upon the hearing a decree was passed dismissing the bill, and an appeal was taken to this court. The Western Union Telegraph Company had accepted the act of 1866, and claimed to erect and maintain a telegraph line under its agreement with the Pensacola and Louisville Railroad Company, and under the provisions of that act. The case, therefore, presented an issue between rights asserted under a statute of Florida and rights given and protected by the act of 1866. The issue was important. The act of 1866 was presented for the first time for interpretation and upon it depended not only the private rights of the contending companies but the more serious conflict of powers derived from the National and state governments. The questions, therefore, which bore on these issues called for, and, it is evident from the opinion of the court, received careful attention.

The first of these questions was whether the act of 1866, was a grant to telegraph companies of portions of the public domain and of rights in the public domain, or a grant of rights having a broader field of exercise—a grant of rights having operation and to be exercised throughout the whole of the United States. There was a marked difference in the rights contended for, and they depended upon different powers. In the public domain the Government was proprietor as well as sovereign, elsewhere only sovereign, and on its powers as sovereign there were limitations, arising not only from the rights of the States, but arising from the ownership of private property and the necessity of a grant of eminent domain to appropriate it. These limitations were of consequence in fixing exactly the rights conferred by the act of 1866, and were regarded by the court in its construction of that act.

The court declared, through Chief Justice Waite, that the act of 1866 was an exercise of the power of Congress over interstate commerce and the power to establish post offices and post roads, and, like other powers of the National Government, could be exercised "upon every foot of territory under

its jurisdiction." It was held, therefore, that the act was not a grant of rights only in the public domain, and the character of the rights was made unmistakable. The statute, the court said, "*in effect amounts to a prohibition of all state monopolies*" in commercial intercourse by telegraph. This is expressed more than once as the fundamental idea and sole purpose of the statute. The court further said: "It (the statute) substantially declares, in the interest of commerce and the convenient transmission of intelligence from place to place by the Government of the United States and its citizens, that the erection of telegraph lines shall, *so far as state interference is concerned*, be free to all who will submit to the conditions imposed by Congress, and that corporations organized under the laws of one State for constructing and operating telegraph lines shall not be excluded from prosecuting their business within its jurisdiction, if they accept the terms proposed by the National Government for this national privilege. *To this extent*, certainly, the statute is a legitimate regulation of commercial intercourse among the States, and is appropriate legislation to carry into execution the power of Congress over the postal service.

And this construction, making the act of 1866 merely an exercise of national power to withdraw from state control or interference commercial intercourse by telegraph, is further emphasized in the opinion and the objections to it completely answered, which were based on the ownership of the post roads by individuals or corporations, and the necessity of implying a grant of the power of eminent domain to telegraph companies to appropriate them. The court said (p. 11):

"It [the act of 1866] gives no foreign corporation the right to enter upon private property without the consent of the owner and erect the necessary structures for its business, but it does provide, that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges."

And again (p. 12):

"No question arises as to the authority of Congress to pro-. vide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. The use of public property alone is granted. If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized. State sovereignty under the Constitution is not interfered with. Only national privileges are granted."

This language and the distinctions imported by it were approved in *Western Union Telegraph Company* v. *Ann Arbor Railroad Co.*, 178 U. S. 239. It was a bill in equity filed in the Circuit Court of Benzie County, Michigan, by a telegraph company against a railway company to restrain the latter from interfering with the rights of the telegraph company in a certain telegraph line along the right of way of the railroad. It was removed to the Circuit Court of the United States. The Circuit Court dismissed the bill, and its action was affirmed by the Circuit Court of Appeals. 33 C. C. A. 113. The Western Union Telegraph Company brought the case here. The decrees of both courts were reversed and the case remanded to the Circuit Court with directions to remand the case to the state court. This was decreed on the ground that, by the statement of the complainant's (telegraph company) own case, it was not brought "within the category of cases arising under the laws or Constitution of the United States." We said that the bill was in effect for the specific performance of a contract. "It is not argued," we said (p. 243), by the Chief Justice, "by counsel for the telegraph company that the telegraph company had any right under the statute, and independently of the contract, to maintain and operate this telegraph line over the railroad company's property; and it has been long settled that that statute did not confer on telegraph companies the right to enter on private property without the consent of the owner, and erect the necessary structures for their busi-

ness; 'but it does provide that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges.' "

And further (p. 244): " As we have said, it was not asserted in argument that the telegraph company had the right independently of the contract to maintain its line on the railroad company's property, and in view of the settled construction of the statute, we could not permit such a contention to be recognized as the basis of jurisdiction." In other words, by the decision in the *Pensacola* case no such Federal question remained to be based on the act of 1866.

Counsel, however, pronounce the extracts quoted from the *Pensacola* case and their repetition in the *Ann Arbor* case as *dicta*, and urge besides that the irresistible logic of other cases overthrows the authority of both. Neither proposition is tenable. We have said enough to demonstrate that the language we have quoted was the deliberate resolution of the court, and we might content ourselves by observing that, as the *Ann Arbor* case is the last expression of this court interpreting the act of 1866, prior cases, if not reconcilable with its exposition of that act, are superseded. We think they are so reconcilable.

One of the cases which is relied on, *Western Union Telegraph Co.* v. *Massachusetts*, 125 U. S. 530, asserted the very valuable right obtained by telegraph companies under the act of 1866, and vindicated it against a statute of Massachusetts, which provided for an injunction against the prosecution of business by the company as a means of enforcing the payment of taxes. This is the very essence of the effect given to the act of 1866 by the *Pensacola* and *Ann Arbor* cases. The telegraph company was in occupation of the post roads of the State of Massachusetts, whether railroads or the ordinary highways does not appear. Its right to be there was not controverted, and how it got there was of no consequence. Its right to do business after and during such occupation was

involved and was decided, and to this right the language of the court was addressed, and received limitation from it.  The language of the court was substantially the same as that of the act of Congress.  It enforced the right given by that act, and gave to the telegraph company the protection of the national power and supremacy, and differs only in the instance, not in the principle, declared in the *Pensacola* case. The telegraph company, indeed, sought for more than the mere exercise of a right.  It sought to turn the act of 1866 from a mere permission to exercise a right to the creation of such an instrumentality of the National Government as to be exempt from state taxation.  The court rejected that view.

So also must be limited the language in *Telegraph Company* v. *Texas*, 105 U. S. 460, and *United States* v. *Union Pacific Railway Co. & Western Union Telegraph Co.*, 160 U. S. 1. In the first the distinction which was necessary to make was between *intra* and *inter*state commerce, and to determine what rights as to the latter were conferred by the act of 1866. In the second case the efficacy of the act to prevent binding contracts against its policy was involved.  The case called for that but no more, as far as the act of 1866 was concerned. Such an agreement was set up, and under it the Western Union Telegraph Company claimed the right to exclude all other telegraph companies from the roadway of the railway company, notwithstanding the act of 1866.  Mr. Justice Harlan, speaking for the court, said (p. 42), that such an agreement "directly tended to make the act of July 24, 1866, ineffectual, and was, therefore, hostile to the object contemplated by Congress. *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1, 11."

We need not dissent from these views or qualify the general language by which they were amplified and supported.  Whatever rights were granted by the act of 1866 were granted to all telegraph companies, and could not be defeated by a binding contract with some one company, nor could such an agreement be used to evade or escape the commands of the statute

constituting the Union Pacific Railway, passed in 1862, or the supplementary act of 1888, which was passed by virtue of a power reserved in the act of 1862. The suit was brought to enforce the duties and obligations imposed by those statutes on the railway company. The statutes are quoted in the opinion, and the act of 1866 is referred to only as reinforcing the provisions of the statute of 1862. It was only necessary, therefore, to declare the policy of the act of 1866 as a grant of rights to all telegraph companies. The consideration of the court was not directed to anything else. The extent of the rights granted as presented in the case at bar could not have been in contemplation. They were not in issue, and it could not have been intended to anticipate and decide the controversies which might be based upon them.

*St. Louis* v. *Western Union Telegraph Company*, 148 U. S. 92, is also urged by the Telegraph Company as inconsistent with the *Ann Arbor* case. It is clearly not so. The case involved the validity of a charge or rental made by the city of St. Louis for the use of its streets by the telegraph company. The charge was imposed by the same ordinance that gave permission to the telegraph company to occupy the streets of the city. The telegraph company resisted the charge upon several grounds, among which were the provisions of the act of 1866, and its acceptance by the company. The charge was held to be a valid one, but on no ground which involved the consideration of the right of the telegraph company to occupy the streets. The right was not disputed. The ordinance of the city conferred it. The claim made under the act of 1866 was that it exempted the telegraph company from a payment of any compensation. But compensation was decreed on the ground that the franchise or privilege granted by the act of 1866 could only be exercised in subordination to public as well as private rights, and, as entry upon the latter could only be made upon the payment of just compensation, entry upon the former was subject to the same payment. This was all that was necessary to decide to sustain the charge made by the

city. In other words, it was all that was necessary to decide to meet the extreme contention made by the telegraph company, that under the act of 1866 it was entitled to occupy the streets without charge, notwithstanding its occupation was exclusive and permanent, as the court said it was. It is manifest that to hold there can be no entry upon property without payment of compensation, is not to decide that such entry can be made upon tender of compensation. Certainly, as to private property or rights, the non-consent of the owner is a factor to be dealt with. Non-consent, if resolute, can only be overcome by power conferred by law; in other words, by the exercise of eminent domain. The act of 1866 was not considered in that regard.

By this review of the cases it is evident that there is no inconsistency between them and the *Pensacola* case and the *Ann Arbor* case, and we are brought to the discussion of the general considerations urged against the latter cases. Construed, as they construe the act of 1866, it becomes meaningless, counsel say. If the act grants no rights, it is urged, except by permission of the railroad companies, it confers no more than can be obtained from the railroad companies. The objection is best answered by examples. The telegraph company had such permission in the *Pensacola* case. It needed, however, the act of 1866 to make its exercise effectual against the legislation of the State of Florida. In the *Union Pacific* case a claim of a monopoly by one telegraph company was answered by the act construed as a grant of rights to all companies. These examples show important results achieved by the act, and the principles of the cases may come to be applied to prevent other hostile action of States or individuals.

This court, when it came to consider the act of 1866 in the *Pensacola* case, was confronted, as we are confronted now, with the serious nature of the right of eminent domain. It is indeed "inseparable from sovereignty," but it is accompanied and restrained by inexorable limitations. The property taken must be for a public use, and there must be com-

pensation made for it, and compensation, whether it be regarded as part of the power or a limitation upon the power, is so far essential that the absence of a provision for it has been regarded as important in determining the intention of the legislature when a grant of such power is claimed. 1 Lewis Eminent Domain, section 240, and cases cited. We said in *Sweet* v. *Rechel*, 159 U. S. 380, 399, by Mr. Justice Harlan: "It is a condition precedent to the exercise of such power (eminent domain) that the statute make provision for reasonable compensation to the owner." Many state cases were cited, and also (p. 402), *Cherokee Nation* v. *Southern Kansas Railway Co.*, 135 U. S. 641. The act of Congress under review in the latter case, it was contended, did not provide for compensation for the property taken. In reply, Mr. Justice Harlan, delivering the opinion of the court, said (p. 659): "The objection to the act cannot be sustained. The Constitution declares that private property shall not be taken 'for public use without just compensation.' It does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken. But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation before his occupancy is disturbed. Whether a particular provision be sufficient to secure the compensation to which, under the Constitution, he is entitled, is sometimes a question of difficulty." The requirements of the Constitution were held to be fully met because the act which was under consideration provided that before the railway which was authorized should be constructed through any of the lands proposed to be taken, full compensation should be made to the owner for all property taken, or damage done by reason of the construction of the road, and in the event of an appeal from the finding of the referee the railway company should pay into court double the amount of the award to abide the judgment.

In *Kohl et al.* v. *United States*, 91 U. S. 367, acts of Congress were considered, one providing for the acquisition of a site

for a public building, the other an appropriation act. The appropriation made by the latter was "for the purchase, at a private sale or by condemnation, of ground for a site" for the building. The real controversy in the case was whether the acts of Congress intended the site to be obtained under the authority of the state government in the exercise of its power of eminent domain or by the United States Government in its own right, and by virtue of its own eminent domain. The court held the latter, and, commenting on the sufficiency of the acts to give the right, said (p. 374): "The authority here given [the first act] was to purchase. If that were all, it might be doubted whether the right of eminent domain was intended to be invoked. . . . That Congress intended more than this is evident, however, in view of the subsequent and amendatory act passed June 10, 1872, which made an appropriation 'for the purchase at private sale or by condemnation of the ground for a site' for the building."

But in the act of July, 1866, there is not a word which provides for condemnation or compensation. The rule that when a right is given all the means of exercising it are given does not, as we have seen, apply to the extent contended for by the Telegraph Company. The exercise of the power of eminent domain is against common right. It subverts the usual attributes of the ownership of property. It must, therefore, be given in express terms or by necessary implication, and this was the reasoning in the *Pensacola* case and applied directly to the act of 1866. We may repeat the language of the court: "If private property is required it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized."

In *Sweet* v. *Rechel, Cherokee Nation* v. *Kansas Railway Co.,* and *Kohl* v. *United States,* all cited *supra,* the property to which the constitutional protection was applied was property in private use. Their doctrine applies as well to private property devoted to a public use. There is no difference whatever in principle arising from the difference in the uses.

A railroad right of way is a very substantial thing. It is more than a mere right of passage. · It is more than an easement. We discussed its character in *New Mexico* v. *United States Trust Co.*, 172 U. S. 171. We there said (p. 183) that if a railroad's right of way was an easement it was "one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it corporeal, not incorporeal, property." And we drew support for this from a New Jersey case, in which State the rights of way in the case at bar are situated. We quoted *N. Y., Susquehanna & Western Railroad* v. *Trimmer*, 53 N. J. L. 1, 3, as follows: " 'Unlike the use of a private way—that is, discontinuous—the use of land condemned by a railroad company is perpetual and continuous.' " And it is held in Pennsylvania " that a railway company is a purchaser, in consideration of public accommodation and convenience, of the exclusive possession of the ground paid for to the proprietors of it." *Philadelphia & Reading Railroad Co.* v. *Hummell*, 44 Pa. St. 375. It is "a fee in the surface and so much beneath as may be necessary for support. . . But whatever it may be called, it is, in substance, an interest in the land, special and exclusive in its nature." *Pennsylvania Schuylkill Valley R. R. Co.* v. *Reading Paper Mills*, 149 Pa. St. 18; *Philadelphia* v. *Ward*, 174 Pa. St. 45; *Railway* v. *Peet*, 152 Pa. St. 488.

. A railroad's right of way has, therefore, the substantiality of the fee, and it is private property even to the public in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part except upon the payment of compensation. In other words, it is entitled to the protection of the Constitution, and in the precise manner in which protection is given. It can only be taken by the exercise of the powers of eminent domain, and a condition precedent to the exercise of such power is, we said, in *Sweet* v. *Rechel*, that the statute conferring it make provision for reasonable compensation to the owner of the property taken. This condition is expressed

with even more emphasis in *Cherokee Nation* v. *Southern Kansas Ry. Co., supra.*

A few more words may be necessary to avoid all possible misunderstanding of the purpose for which we have cited those cases and *Kohl* v. *United States.* We have cited them, not as tests of the validity of the act of 1866, but as tests of its, meaning, supporting the authority of the *Pensacola* case and *Ann Arbor* case. We have no occasion to consider the validity of the act of 1866 as an attempt to grant the power of eminent domain. We decide the act to be an exercise by Congress of its power to withdraw from state interference interstate commerce by telegraph. As such, of course, the act is an efficient and constitutional enactment.

Certain cases decided at circuit are cited for our consideration, and we will close this branch of our discussion by a brief review of them.

In *Postal Telegraph Cable Co. of Idaho* v. *Oregon Short Line Railroad Company,* 104 Fed. Rep. 623, and *Postal Telegraph Cable Company* v. *Oregon Short Line R. R. Co.,* 114 Fed. Rep. 787, there were views expressed favorable to the contentions made in the case at bar by the Telegraph Company, but the judgments in both cases were ultimately rested upon the local statutes—Idaho and Montana—which granted the right of eminent domain to telegraph companies. We may also observe that the first case went to the Circuit Court of Appeals of the Ninth Circuit. That court sustained the judgment of the Circuit Court upon the statute of Idaho and upon general legal principles. It did not refer to the act of 1866. 111 Fed. Rep. 842.

In *Postal Telegraph Cable Co.* v. *Southern Railway Co.,* 89 Fed. Rep. 190, and *Postal Telegraph Cable Co.* v. *Cleveland, C. & St. L. Ry. Co.,* 94 Fed. Rep. 234, the act of 1866 was more directly passed on. Both cases were proceedings in eminent domain—one brought in the courts of North Carolina and removed to the Circuit Court of the United States; the other brought in the Circuit Court of the United States for the

Northern District of Ohio. In passing on the sufficiency of the petition in the first case, Judge Simonton said that the right of petitioner to construct its lines along the right of way of post roads of the United States was given under the act of Congress of 1866, but, he observed, "the mode or method of exercising the right conferred was fixed by the laws of the several States, and it was exclusive in its character in ascertaining the amount of compensation to be allowed." The right of the Telegraph Company was, therefore, considered and adjudged under the North Carolina statutes.

In the second case a motion was made to dismiss on the ground that the power of eminent domain was not conferred by any law of the United States or the State of Ohio. The motion was sustained. District Judge Ricks said: "The act of July 24, 1866, made no provision for compensation or payment for property to be taken, hence the procedure cannot be sustained by virtue of that act." He cited the *Pensacola* case, *supra*.

*The Western Union Telegraph Company* v. *Ann Arbor R. R. Co.*, 33 C. C. A. 113, and *St. Paul M. & M. Ry. Co.* v. *Western Union Telegraph Co.*, 118 Fed. Rep. 497, were respectively decided by the Circuit Court of Appeals of the Sixth Circuit and the Circuit Court of Appeals of the Eighth Circuit. It is difficult to reconcile them. In one it was decided, following the authority of the *Pensacola* case, that the Telegraph Company could not occupy the line of the defendant's railroad without its consent or that of some predecessor in title. This was wanting. In the other, it was conceded that the right of entry upon private property was not conferred by the act of 1866, without the owner's consent, yet held that, as consent had been given, no reason could be perceived why a court of equity should compel a removal of the Telegraph Company's lines from the railway's right of way, " especially where it appears that *no express agreement was made that they should be removed when its lines were erected.*"

2. It is contended by the Telegraph Company that the charters under which the several railway companies constituting the system of the Railroad Company were organized expressly created them "public highways," and that in the acquisition of land for their purposes they were public agents, "and the land was taken by the Government, and in the eye of the law as completely subject to public uses as though it had been taken by the State itself "—that is to say, if we understand the argument, have become highways in the full sense of that word. And counsel further say the difference between them and ordinary highways " is not a legal difference, but is the difference of the kind of use to which the highway is subject—in the one case, wheel vehicles drawn by horses; in the other, to steam vehicles drawn by locomotives along and upon iron rails." They are subject, therefore, it is urged, as ordinary highways and streets of a city are subject, to the control of Congress by virtue of its power over interstate commerce.

Counsel in advancing the argument exhibit a consciousness of taking an extreme position. It would seem, certainly if considered with other parts of their argument, to make a railroad right of way public property. To that extreme we cannot go, for the reasons which we have already indicated. The right of way of a railroad is property devoted to a public use, and has often been called a highway, and as such is subject, to a certain extent, to state and Federal control, and for this many cases may be cited. But it has always been recognized, as we have pointed out, that a railroad right of way is so far private property as to be entitled to that provision of the Constitution which forbids its taking, except under the power of eminent domain and upon payment of compensation. The right of way of a railroad was recognized as private property in the *Pensacola* case, and we are brought back to the main question—the interpretation of the act of July, 1866, and upon that we have sufficiently dilated.

It follows from these views that the act of 1866 does not

grant the right to telegraph companies to enter upon and occupy the rights of way of railroad companies, except with the consent of the latter, or grant the power of eminent domain. Nor does the statute of New Jersey make those rights of way public property so as to subject them to such occupation under the provisions of the act of 1866.

It is admitted that the statutes of New Jersey do not confer the right of eminent domain upon the Telegraph Company.

3. In view of our conclusion, it is not necessary to consider the question whether, if the power of eminent domain were granted by the act of 1866, it would be within the competency of a court of equity to ascertain compensation, or that compensation might be determined at law. That question was pertinent in *Kohl et al* v. *United States*, 91 U. S. 367. It is not pertinent in this case. The acts of Congress passed on in *Kohl et al* v. *United States*, as we have seen, provided for the appropriation of a site for a public building by purchase or *by condemnation*. By the act of 1866 power of condemnation is not given, and, of course, methods of procedure are not involved in its construction.

It is equally unnecessary to consider the questions which might arise if the State of New Jersey gave the right of eminent domain to the Telegraph Company. It is conceded by counsel that such right does not exist, and it happens that under the policy of New Jersey the right of way of the Railroad Company enjoys in that State immunity from compulsory proceedings instituted by the Telegraph Company. But this has no bearing on the act of 1866, nor does it make that act, as construed by us, a grant to railroads of greater power over commercial intercourse by telegraph than the States have. Indeed, we think, a comparison between the States and railroads in that regard is misleading and overlooks the essential difference between restraints on the legislative power of the States and the rights of property.

On account of those restraints, it may be, and finding no

impediment in the rights of property, interstate commerce, by telegraph, has marched to a splendid development, although in the acquisition of the means for its exercise it has relied on the consent of the owner of private property, or the power of eminent domain conferred by the States. We cannot but feel, therefore, that there is something inadequate in the argument which is based on the apprehension that the act of July 24, 1866, construed, as we construe it, gives a sinister power to railroad companies. It gives no power to those companies but that which appertains to the ownership of their property.

*Decree affirmed.*

MR. JUSTICE BREWER concurred.[1]

MR. JUSTICE HARLAN, dissenting.

In view of the importance of these cases I do not feel that any dissent from the opinion and judgment of the court should be expressed, unless the grounds of such dissent be fully disclosed.

The controlling question before the court is, whether the Western Union Telegraph Company is entitled, in virtue of any existing acts of Congress, to keep and maintain its telegraph lines upon the right of way of the Pennsylvania Railroad Company, assuming that the ordinary travel on that road will not be thereby interfered with.

Congress, having power to establish post offices and post roads, has declared all railroads in operation within the limits of the United States to be Post Roads and Post Routes. 5 Stat. 271, 283, c. 172; 10 Stat. 249, 255, c. 146; Rev. Stat. § 3964; 23 Stat. 3, c. 9.

There was, for many years, as all know, and therefore as the court may judicially know, a widespread belief that the Government and the people of the country were at great disadvantage in matters of business and intercourse as involved

---

[1] For concurring opinion of MR. JUSTICE BREWER, see p. 593, *post*.

in the use of the telegraph. The conviction was strong and universal that the control of the post roads of the country was being exerted by great railroad corporations in such way as to subserve private and corporate interests at the expense of the United States and without any regard for the convenience of the general public. As a remedy for those evils Congress passed the act of July 24, 1866, entitled "An act to aid in the construction of telegraph lines, and to secure to the Government the use of the same for postal, military and other purposes." 14 Stat. 221, c. 230. By that act Congress conferred upon any telegraph company organized under the laws of any State "the *right* to construct, maintain and operate lines of telegraph," not only through and over the public domain and over, under or across the navigable streams or waters of the United States, but "over and along *any* of the military or *post roads* of the United States." By the same act it is declared that on the lines of such companies telegraphic communications between the several departments of the Government should be at rates to be annually fixed by the Postmaster General, and have priority over all other business. § 2. To the exercise of the right thus given, Congress annexed several conditions, but the only one pertinent to the present discussion is the condition that the telegraph lines erected by any company accepting the provisions of the act should be so constructed and maintained as not to obstruct the navigation of the navigable streams and waters of the United States or "interfere with the ordinary travel on such military or post roads."

The object of the act, this court has said, all its members concurring, "was not only to promote and secure the interests of the Government, but to obtain, for the benefit of the people of the entire country, every advantage, in the matter of communication by telegraph, which might come from competition between corporations of different States;" that "it was very far from the intention of Congress, by any legislation, to so exert its power as to enable one telegraph corporation, Federal

or state, . . . to acquire exclusive rights over any post road;" and that "no railroad company, operating a post road of the United States, over which interstate commerce is carried on, can, consistently with the act of July 24, 1866, bind itself, by agreement, to exclude from its roadway any telegraph company, incorporated under the laws of a State, which accepts the provisions of that act, and desires to use such roadway for its line in such manner as will not interfere with the ordinary travel thereon." *United States* v. *Union Pacific Railway Company & Western Union Telegraph Company*, 160 U. S. 1, 44, 49. Yet, by its present construction of the act of 1866 the court—if we do not misapprehend its opinion—holds that the right which that act gives to construct, maintain and operate a telegraph line upon a post road cannot, in virtue of that act, or under any existing legislation, be exercised by the Western Union Telegraph Company, against the will of the railroad company operating such road; and this, notwithstanding it be absolutely clear that the occupancy of the post road by the telegraph lines of the particular company proposing or desiring to erect them would not, in the slightest degree, interfere with the ordinary travel on such road. It is now held, in effect, that, so far as that act is concerned, and despite its explicit provisions, even the Government cannot, except with the assent of the Railroad Company, enjoy the advantages sought to be secured by its passage. I think it was intended by the act of 1866, in the interest of the postal service and of interstate trade and intercourse, to throw open all the post roads of the country to the use of telegraph companies accepting its provisions, subject to the condition that such use should not interfere with ordinary travel on the post roads so occupied. And that intention is in harmony with the doctrine often announced by this court, that "a railroad is a public highway, established primarily for the convenience of the people, and to subserve public ends, and, therefore, subject to governmental control." *Cherokee Nation* v. *Southern Kansas Ry. Co.*, 135 U. S. 641, 657; *Olcott* v. *Supervisors*, 16

Wall. 678, 694; *United States* v. *Joint Traffic Association*, 171 U. S. 505; *Wisconsin &c. R. R. Co.* v. *Jacobson*, 179 U. S. 287.

But it is suggested that the Telegraph Company has not been expressly invested with the power of eminent domain. Nevertheless, it has been given, by express words, the *right* to construct, maintain and operate its lines on any *post road* of the United States; and as it is not contended that Congress has exceeded its power in granting that right the question is whether the right so given can be made effective by any mode of procedure known to our jurisprudence. I have always supposed it to be competent for a court of the United States, having general jurisdiction of suits at law and in equity, in some efficient mode, by some process or form of procedure, to enforce and protect any right constitutionally conferred by the legislative department. The principle is illustrated in *Osborne* v. *Missouri Pacific Railway Company*, 147 U. S. 248, which was an action to enjoin the construction of a track along a public street, because of irreparable damage to be thereby inflicted on the plaintiff. This court, following the decision of Judge Brewer, now of this court, in *McElroy* v. *Kansas City*, 21 Fed. Rep. 257, said (p. 249): "If the defendant had an ultimate right to do the act sought to be restrained, but only upon some condition precedent, and compliance with the condition was within the power of the defendant, the injunction would almost universally be granted until the condition was complied with; but if the means of complying with the condition were not at defendant's command, then the court would adjust its order so as to give complainants substantial benefit of the condition, while not restraining defendant from the exercise of his ultimate rights. Inasmuch as, while the statutes of Missouri provided for the assessment of damages resulting from the taking of property for public use, there existed no provision to attain that result where the property was merely damaged, an injunction was granted, with leave to the defendant to apply for the appointment of a board of commissioners to ascertain and report the damages which complainant would

sustain, upon payment of which the injunction would be vacated." This principle was recognized in the recent case of *New York City* v. *Pine*, 185 U. S. 93.

It is said by counsel that the right given by the act of 1866 is necessarily subject to the condition prescribed by the constitutional provision that private property shall not be taken for public use without just compensation, and that the property interest of the Railroad Company in its right of way cannot be permanently taken from it for public purposes, against its will, without making such compensation.

Upon the subject of compensation the court reproduces from the opinion in *Sweet* v. *Rechel*, 159 U. S. 380, 399, this detached sentence: "It is a condition precedent to the exercise of such power [eminent domain] that the statute make provision for reasonable compensation to the owner." But the court does not apply any such rule to the present case and holds that the act of 1866 is invalid *as not making provision for compensation.* Besides, the above sentence taken in connection with the one immediately preceding it shows clearly that what was said had reference to the taking of *private* property for public use without provision being made in the statute for compensation. The entire paragraph from which the above sentence was taken reads: "When, however, the legislature provides for the actual taking and appropriation of private property for public uses, its authority to enact such a regulation rests upon its right of eminent domain—a right vital to the existence and safety of the Government. But it is a condition precedent to the exercise of such power that the statute make provision for reasonable compensation to the owner." What was said in *Sweet* v. *Rechel* plainly had no reference to property of a public or *quasi*-public nature. The same observations may be made in reference to the quotation made from *Cherokee Nation* v. *Southern Kansas Ry. Co.,* 135 U. S. 641. What was said in that case had also reference to the taking of private property. If the court were now of opinion that the act of 1866 was invalid *as*

*not making provision for compensation,* then the object of citing *Sweet* v. *Rechel* and *Cherokee Nation* v. *Kansas Railway* would be both manifest and appropriate. But the court does not hold that the act of 1866 is objectionable on any such ground. On the contrary, it holds a railroad right of way to be private property, and yet, despite its citation of the above cases, recognizes the validity of the act, although it makes no provision for compensation to the owner. It may not be appropriate for me to say that I adhere to what was said in *Sweet* v. *Rechel* and *Cherokee Nation* v. *Southern Kansas Ry. Co.,* the opinions in both of which cases were written by myself, speaking for the court. Whether a railroad right of way over a post road of the United States—such road being a public highway established primarily for the public convenience and subject to governmental control—is private property within the rule that a statute authorizing private property to be taken for public use must make provision for compensation, is a question not wholly free from doubt, and it need not be here discussed; for, the court does not hold that the act of 1866 is subject to that objection.

But let it be granted, for the purposes of this case, that a railroad company has such a property interest in its right of way that it is entitled to compensation, if such right of way be appropriated to the use of a telegraph company, accepting the act of 1866; still, the question remains in what way or by what mode may such compensation be legally ascertained? May it not be ascertained by a court of general jurisdiction, when all parties in interest are regularly being brought in? Here the Telegraph Company comes into the Circuit Court of the United States and seeks, in virtue of the act of Congress, to enforce the right expressly granted to it of occupying the post road in question with its lines. It expresses its readiness to make such compensation to the Railroad Company as the law requires, and informs the court that it has instituted an action at law to ascertain the amount of such compensation. The bill alleges:

"Your orator says further that it is diligently prosecuting said action on the law side of this court for the ascertainment of the amount of compensation to the said railway companies defendant herein, for the right to the use of said railroads to maintain and operate its telegraph line along and over the lines of said railways as prescribed in said act of Congress of July 24, 1866; and that it will continue to prosecute the same to a final determination as rapidly as the business in said court will permit the said cause to he heard and determined and without any unnecessary delay.

"Your orator prays that this court ascertain, order, adjudge and decree the amount of compensation to be paid by your orator to the defendants, as their rights may severally appear, for the construction, maintenance and operation of your orator's telegraph lines over and along the right of way of the defendants' said railroads, under the terms, provisions and restrictions of said acts of Congress hereinbefore mentioned, or, if this court shall order and determine that the amount of such compensation to the defendants shall be such amount as shall be determined or adjudged in the said action at law, that upon due payment of such compensation by your orator to the defendants this court will order, adjudge and decree that your orator is entitled to a perpetual injunction against the defendants herein and each of them, restraining them and each of them from in any manner interfering with the location, construction, maintenance and operation of your orator's said lines of telegraph upon the roadway or right of way of the said defendants, under and subject to the provisions and restrictions of the said act of Congress of July 24, 1866, and meanwhile and until the final decree of this court that a temporary injunction be issued against the defendants, prohibiting and restraining them and each of them from in any manner interfering with the use and operation of the telegraph lines of your orator upon the said roadway and right of way of the defendants pending the determination of the said action at law, or until the further order of this court in the premises.

And for such other and further relief as the case may require and to your honors may seem just."

*Kohl* v. *United States,* 91 U. S. 367, was an application filed in pursuance of acts of Congress authorizing and directing the Secretary of the Treasury to purchase a site for a public building. A site was selected, but the Secretary and private owners could not agree as to price, and the acts of Congress did not direct the particular mode by which the land should be condemned and the compensation to be made by the Government ascertained. The Secretary of the Treasury, in order to carry out the will of Congress, did not institute formal proceedings of condemnation as one of the acts, under which he proceeded, authorized him to do. But he instituted a suit in a Circuit Court of the United States to appropriate a certain parcel of land for the proposed building. It was objected that the Circuit Court was without jurisdiction, but that objection was overruled. It was contended in argument that while the United States had the right of eminent domain, Congress had not given to the Circuit Court jurisdiction of a proceeding for the condemnation of property brought by the United States in the assertion or enforcement of that right; and that the act of Congress meant that the land for the proposed public building was to be obtained under the authority of the state government in the exercise of its right of eminent domain. It was further contended that if the proceeding was properly instituted in the Circuit Court, then the act of Congress required that it should conform to the provisions of the state law in a like proceeding in the state court. This court said (p. 375): "Doubtless Congress might have provided the mode of taking the land, and determining the compensation to be made, which would have been exclusive of all other modes. They might have prescribed in what tribunal or by what agents the taking and the ascertainment of the just compensation should be accomplished. The mode might have been by a commission, or it might have been referred expressly to the Circuit Court; but this, we think, was not necessary. *The investment of the*

*Secretary of the Treasury with power to obtain the land by condemnation,* without prescribing the mode of exercising the power, gave him *also* the power to obtain it *by any means that were competent to adjudge a condemnation* (p. 376). . .
It is quite immaterial that Congress has not enacted that the compensation shall be ascertained in a judicial proceeding. That ascertainment is in its nature at least *quasi-judicial.* Certainly no other mode than a judicial trial has been provided. . . . *But there is no special provision for ascertaining the just compensation to be made for land taken. That is left to the ordinary processes of the law;* and hence, as the Government is a suitor for the property *under a claim of legal right to take it,* there appears to be no reason for holding that the proper Circuit Court has not jurisdiction of the suit, *under the general grant of jurisdiction made by the act of 1789.*"

In *United States* v. *Jones,* 109 U. S. 513, which was a proceeding to condemn property for the use of the United States, this court, referring to a certain proposition advanced by counsel, said (pp. 518, 519): "There is, in this position, an assumption that the ascertainment of the amount of compensation to be made is an essential element of the power of appropriation; but such is not the case. The power to take private property for public uses, generally termed the right of eminent domain, belongs to every independent government. It is an incident of sovereignty, and, as said in *Boom Company* v. *Patterson,* 98 U. S. 106, requires no constitutional recognition. The provision found in the Fifth Amendment to the Federal Constitution, and in the constitutions of the several States, for just compensation for the property taken, is merely a limitation upon the use of the power. It is no part of the power itself, but a condition upon which the power may be exercised. . . . But there is no reason why the compensation to be made may not be ascertained *by any appropriate tribunal capable of estimating the value of the property. There is nothing in the nature of the matter to be determined which calls for the establishment of any special tribunal by the*

*appropriating power.* The proceeding for the ascertainment of the value of the property and consequent compensation to be made, *is merely an inquisition to establish a particular fact as a preliminary to the actual taking;* and it may be prosecuted before commissioners or special boards or the courts, with or without the intervention of a jury, as the legislative power may designate. All that is required is *that it shall be conducted in some fair and just manner,* with opportunity to the owners of the property to present evidence as to its value, and to be heard thereon."

The vital object of the present suit was to secure the recognition and enforcement of the right of the Telegraph Company, under the act of 1866, to keep and maintain its lines upon the railroad's right of way. If it had such right—the authority to confer the right is, we repeat, not disputed—then this suit in equity was an appropriate mode by which the right could be adequately protected and compensation secured to the railroad company. To assert the right and to ask that the amount of compensation shall be ascertained made the proceeding a suit or controversy within the meaning of the judiciary acts, and made the case one—in legal effect—for condemnation. I perceive no reason why the court, in advance of a final decree recognizing and enforcing that right, could not have instituted, as it was asked to do, an inquiry in respect of the compensation which the Railroad Company was entitled to receive for the proposed use of its right of way, and have made the payment of such compensation a condition precedent to the exercise by the Telegraph Company of the right given by the act of 1866. Having all the parties interested before it, could not the court have directed a jury to be impanelled to inquire, under the direction of the court, as to the amount of compensation to be paid to the Railroad Company? Could it have done any more under regular proceedings of condemnation? Instead of adopting that course, the Circuit Court proceeded upon the ground that even if the use of the defendant's road by the Telegraph Company would not interfere with ordinary travel on and

over it, it was compelled by the former decisions of this court to hold that neither in virtue of the act of 1866, nor of any other exising Federal statute, could the Telegraph Company occupy the railroad's right of way without the consent of the Railroad Company.

The cases in this court which, it is supposed, adopted this view of the act of 1866 are *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1, and *Western Union Tel. Co.* v. *Ann Arbor R. R. Co.*, 178 U. S. 239, 243. But the utmost ingenuity is inadequate to show that the present question was involved in either of those cases, or that the decision in either case depended in the slightest degree on its solution.

It appears from the *Pensacola* case that the Western Union Telegraph Company had the right to place and operate its lines upon the right of way of a certain railroad company between points in Alabama and points in Florida. There was no controversy in that case between the railroad company and the telegraph company as to the right of the latter to have its lines on the railroad right of way. The railroad company, as the report of the case shows, had consented to the occupancy of its right of way by the lines of the Telegraph Company, and that fact was not disputed. The railroad company was not even a party to the suit. It had no quarrel with the telegraph company. What need, then, had the court to consider the rights of the Western Union Telegraph Company, under the act of 1866, when it was conceded that that company had the consent of the railroad company to occupy its right of way? This view of the case was distinctly announced by this court when it said in the *Pensacola* case that "*the present case is satisfied, if we find* that Congress has power, by appropriate legislation, to prevent the States from placing obstructions in the way of its [the telegraph's] usefulness." The sole question in the case was as to the validity of a Florida statute, under which a Florida telegraph company was given *exclusive* telegraphic rights over the route to be occupied by the Western Union Telegraph Company with the consent of the railroad

company; and the charter of the Florida company authorized it to locate and construct its lines within certain named counties of Florida "along and upon any public road or highway, or across any water, or upon any railroad or private property for which permission shall have first been obtained from the proprietors thereof." This court held that the attempt of the State to exercise exclusive control over telegraphic communications between it and other States was in conflict with the commerce clause of the Constitution of the United States, and that the Florida statute was void, so far as it assumed to grant exclusive privileges to a particular telegraph company.

Referring to the act of 1866 the court said (p. 11): "It substantially declares, in the interest of commerce and the convenient transmission of intelligence from place to place by the Government of the United States and its citizens, that the erection of telegraph lines shall, so far as state interference is concerned, be free to all who will submit to the conditions imposed by Congress, and that corporations organized under the laws of one State for constructing and operating telegraph lines shall not be excluded by another from prosecuting their business within its jurisdiction, if *they accept the terms proposed by the National Government for this national privilege.* To this extent, certainly, the statute is a legitimate regulation of commercial intercourse among the States, and is appropriate legislation to carry into execution the powers of Congress over the postal service. It gives no foreign corporation the right to enter upon private property without the consent of the owner and erect the necessary structures for its business; but it does provide that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges." What was meant by the words, "but it [the act] does provide that, whenever the consent of the owner is obtained," I cannot understand. The act of 1866 does not contain any such provision nor anything like it. Not a single word is to be found in it

that refers to the consent of the owner of the property to be taken. The court proceeds: "It is insisted, however, that the statute extends only to such military and post roads as are upon the public domain; but this, we think, is not so. The language is, 'Through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States, which have been or may hereafter be declared such by act of Congress, and over, under or across the navigable streams or waters of the United States.' There is nothing to indicate an intention of limiting the effect of the words employed, and they are, therefore, to be given their natural and ordinary signification. Read in this way, the grant evidently extends to the public domain, the military *and post roads*, and the navigable waters of the United States. These are all within the dominion of the National Government to the extent of the national powers, and are, therefore, subject to legitimate Congressional regulation. No question arises as to the authority of Congress to provide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. The use of *public* property alone is granted. If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized. State sovereignty under the Constitution is not interfered with. Only national privileges are granted."

This language, it seems to me, has not been correctly interpreted. Undue stress has been laid upon the words "private property without the consent of the owner," and the words "private property . . . obtained by private arrangement with its owner." They have been so interpreted as to make the court decide a question not before it, not necessary to the decision, not involved in the isuses made, and never suggested by counsel. The briefs of counsel in that case show that no such question was in their minds; for they as well as the court knew, from the record before them, and as we may know from an examination of that record, that the Western Union Com-

pany was entitled, so far as the consent of the railroad com-
pany was concerned, to maintain its lines on the railroad right
of way. · Upon the above quoted words the contention is based
that the court intended to decide that no railroad right of way
could, *in virtue of the act of* 1866, be occupied by any telegraph
company without the consent of the railroad company first
obtained. I cannot believe that any such question was in-
tended, to be decided. As already shown, the court expressly
said that the only question to be decided was whether Congress
had power to prevent a State from obstructing interstate tele-
graphic communications, by granting exclusive privileges to
a particular telegraph company of its own creation. It is a
mistake to say that the court declared that the *sole* purpose of
the act of 1866 was to prevent state monopolies, or that the
act was merely an exercise of national power to forbid state
interference with telegraphic communications. It did say
that the case then before the court would be satisfied if the
question as to state interference was decided, that is, that the
case involved no other question. Besides, the whole context
of the opinion in the *Pensacola* case shows that the court did
not include railroad property employed in commerce when it
used the above quoted words. It was argued in that case that
the act of 1866 had reference only to the "public domain,"
that is, to the public lands owned by the United States. This
view was distinctly rejected, and post roads were placed by the
court, so far as the privileges granted by the act were con-
cerned, on the same plane as the public domain, so that not
even a State could interfere with the national privilege granted
by Congress, if the telegraph company accepted the terms of
the act. The court said that any telegraph company, ac-
cepting the provisions of the act, could put its lines on any
post road, if ordinary travel thereon was not interfered with,
and that not even the State could stand in the way. It then
added, as if out of abundant caution, and to show that Con-
gress had no purpose to interfere with the rights of private
owners, that no attempt was made by Congress to provide for

the appropriation of private property, and that "the use of *public* property *alone* is granted." Th&t meant that the act had not granted any right to telegraph companies to occupy *private* property with telegraph lines. Having said that the act granted the use of post roads for telegraphic purposes; that it embraced the use of such roads *equally* with the public domain; and that "the use of *public* property *alone* is granted," it is inconceivable that the court employed in the same connection the words "private property," as embracing post roads, or the use of such roads. To relieve the minds of those who apprehended danger arising from the act of 1866 to state sovereignty and to rights that were strictly private, the court took care to say that neither state sovereignty nor private rights were interfered with; that only national privileges were granted; but that, in respect of the use of the public domain and military and *post roads*, Congress had power to pass the act of 1866, and in dealing with the use of post roads, by telegraph companies, it dealt with public property.

When the court held in the *Pensacola* case that telegraphic communications between the States could be regulated by Congress under its power to regulate commerce, and that the statute of Florida, which assumed to give to a Florida telegraph company an exclusive right in respect of telegraphic communications over certain territory in that State, was inconsistent with the act of 1866, that was an end of that case, and nothing remained to be done, except to dismiss the suit. The court itself so declared. Nothing more was in issue between the parties. The case involved, I confidently insist, no question as to the previous assent of the railroad company being a condition of the exercise by the Western Union Telegraph Company, of the rights given by the act of 1866.

Nor is the case of *Western Union Tel. Co.* v. *Ann Arbor R. R. Co.*, 178 U. S. 239, 243, 244, an authority for the action of the Circuit Court. That was a case in which the only relief sought was the *specific performance* of a contract under which a telegraph company claimed the right to remain in the occupancy

of the right of way of a railroad company. The court perti-nently observed in that case that it was not claimed that "the telegraph company had any right under the statute, and in-dependently of the contract, to maintain and operate this telegraph line over the railroad company's property." It was, however, claimed that as the telegraph company was in the discharge of public duties, the Circuit Court "should have so framed its decree as to preserve the occupancy of the telegraph company, subject to making compensation to the railroad company, the value of the alleged easement, to be ascertained by the court." But that view was rejected because the bill "was not framed in that aspect," and so as to protect the occupancy of the telegraph company subject to the condition of its making compensation, and the court also said that the relief asked could not be given under the prayer for general relief, because not "agreeable to the case made by the bill."

Now, the present bill has been framed so that the court can protect the right given to the Telegraph Company by the act of 1866 to have its wires and poles on the company's right of way, upon its being ascertained that such use will not inter-fere with the ordinary travel on the railroad, just compensa-tion being made for that use, and the amount of compensation to be ascertained by the court in some appropriate way.

In my judgment, nothing involved or in judgment in the Pensacola and Ann Arbor cases requires the affirmance of the decree of the Circuit Court.

The affirmance of that decree of the Circuit Court will mean that the efforts of Congress, by the act of 1866, to ob-tain for the people of the country the advantages accruing from competition between corporations of the different States in the matter of telegraphic communications, and also to pro-mote and secure the interests of the Government as involved in the conduct of its postal and military business, will prove of but little value. Indeed, as construed, it might have been better for the country if the act of 1866 had not been passed, and the States left free to establish such regulations in refer-

ence to telegraphic communications, within and over its territory, as would be appropriate and valid in the absence of Congressional legislation on the subject. As the matter now stands, the whole subject is practically committed to the railroad companies. The court says that the act of 1866 is an efficient enactment for the purpose of preventing state interference with interstate telegraphic communications. As now construed, it would seem to be most efficient in tying the hands of the States and leaving railroad companies operating post roads, so far as existing legislation is concerned, absolute masters of interstate communication by telegraph.

In the *Pensacola* case it was decided, and I think rightly, that in respect at least, of interstate telegraphic communications, a State could not give exclusive privileges to a particular telegraph company. But, as just stated, by the necessary operation of the judgment now rendered a railroad company, operating a post road, can, in effect or practically, confer exclusive privileges upon a particular telegraph company, in respect of its right of way, by simply withholding its consent for a second telegraph company to occupy any part of such right of way with its wires and poles. If the Government should be of opinion that the public business imperatively required another telegraph line upon the post road now occupied by the Pennsylvania Railroad, that company need only object to other telegraph lines being placed upon its right of way, and that will be the end of the matter, so far as the act of 1866, as now construed, is concerned. If the Government, and a telegraph company fully equipped, should jointly represent to the railroad company that an additional company can be admitted to its right of way without obstructing the ordinary travel on that road, the company need only reply that no other telegraph company than the one now there can occupy its right of way, and that will be the end of the matter, so far as the act of 1866, as now construed, is concerned. All this is now made possible, notwithstanding the decision of this court in *United States* v. *Union Pacific Rail-*

*way,* 160 U. S. 1, above cited.   In that case we propounded this question, p. 44: "Can it be said that after the passage of the act of 1866, and while it was in force, a railway company, operating a post road of the United States, could, by any form of agreement, exclude from its roadway a telegraph company which had accepted the provisions of that act?"   We said that this question could be answered only in one way, "namely, that every railroad company operating a post road in the United States, over which commerce among the States is carried on, was inhibited, after the act of July 24, 1866, took effect, from making any agreement inconsistent with its provisions or that tended to defeat its operations."   The court added that it was very far from the intention of Congress by any legislation to so exert its power as to enable one telegraph corporation, Federal or state, to acquire exclusive rights over any post road.   But now, a railroad corporation operating a post road, and wishing its right of way occupied only by a single company, with which it may have a special business arrangement, for its own purposes, need not make even a secret agreement granting exclusive privileges to that company.   It need only keep silence and withhold its assent to the occupancy of its right of way by another company, and in that way give exclusive privileges to the company with which it has a special arrangement; it may be to one organized wholly in the interest of the railroad company.   In the *Pensacola* case it was said that one of the objects of the act of 1866 was to prevent state monopolies in telegraphic communication, and that the privilege granted by that act was a national privilege.   Now, although state monopolies cannot exist, railroad monopolies in telegraphic communications may exist; and the national privilege granted by the act of 1866 is left at the mercy of railroad companies operating the post roads of the United States.

Practically, the railroad corporations operating post roads —looking to their own interests and perhaps caring little for the general welfare—are recognized as now having more power

than a State. I cannot assent to any interpretation of the act of 1866 from which such a result can follow. No such result is, in my opinion, consistent either with the words of the act or with the objects which Congress, as this court has said, intended to accomplish by its passage. The act, reasonably interpreted, was, I think, intended to give a telegraph company accepting its provisions the absolute right to put its wires and poles upon any post road—a public highway established primarily for the public convenience—if the ordinary travel on such road was not thereby interfered with.

For these reasons, I am constrained to dissent from the opinion and judgment of the court.

MR. JUSTICE BREWER, concurring.

I concur in the judgments in these cases but do so distinctly on the ground that the questions have been settled in prior cases. If the matter was *res integra* the views expressed by Mr. Justice Harlan would be very persuasive. *Pensacola Telegraph Company* v. *Western Union Telegraph Company,* 96 U. S. 1, and *Western Union Telegraph Company* v. *Ann Arbor Railroad Company,* 178 U. S. 239, seem to me controlling. In the first of these cases, the scope of the power and authority granted by the act of 1866 was distinctly presented. It was within the proper limits of inquiry, and the opinion of the court shows that it was fully considered. The declarations in that opinion are clear and precise, and cannot be considered in any just sense *obiter dicta*. The decision was announced in 1877, and was reaffirmed in 1890 in the *Ann Arbor* case. If the court erred in its construction of the act, Congress has had twenty-seven years in which to correct the mistake. Its omission to take any action must be considered as an acquiescence on its part in that construction. And I am of the opinion that when this court has construed a statute of Congress, and that construction has remained for more than a

quarter of a century, neither changed by any judicial decisions or set aside by any Congressional legislation, it ought not to be disturbed except for the most cogent reasons.