476 F.2d 829
 KANSAS CITY SOUTHERN RAILWAY COMPANY, a corporation,
Plaintiff-Appellant,
v.
ARKANSAS LOUISIANA GAS COMPANY, a corporation, Defendant-Appellee.
FORT SMITH AND VAN BUREN RAILWAY COMPANY, a corporation,
Plaintiff-Appellant,
v.
ARKANSAS LOUISIANA GAS COMPANY, a corporation, Defendant-Appellee.
 No. 72-1369.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Sept. 20, 1972.
Decided March 27, 1973.
 
 Burton J. Johnson, Oklahoma City, Okl. (Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., on the briefs) for plaintiffs-appellants.
 G. C. Mayhue, Jr., Ada, Okl. (Conn, Mayhue, Kerr & Mayhue, Ada, Okl., on the brief) for defendant-appellee.
 Before PHILLIPS, SETH and HOLLOWAY, Circuit Judges.
 ORIE L. PHILLIPS, Circuit Judge.
 
 
 1
 The Kansas City Southern Railway Company[1] and the Fort Smith and Van Buren Railway Company[2] brought this action against the Arkansas Louisiana Gas Company.[3] The two railways will be referred to collectively as the Railway Companies.
 
 
 2
 By the Act of February 27, 1893, the predecessor of the Southern Railway Company was "invested and empowered with the right of locating, constructing, operating, using, and maintaining a railroad, telegraph, and telephone line through the Indian Territory, * * * with the right to construct, use, and maintain such tracks, turnouts, sidings, and extensions as said company may deem its interest to construct along and upon the right of way * * *." 27 Stat. 487.
 
 
 3
 The pertinent parts of Sec. 2 of such Act read as follows:
 
 
 4
 "SEC. 2. That said corporation is authorized to take for all uses of a railroad, telegraph, and telephone line, and for no other purposes, a right of way one hundred feet in width through said Indian Territory, * * * with the right to use additional grounds where there are heavy cuts or fills as may be necessary for the construction and maintenance of the roadbed, * * *And provided further, That no parts of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used except in such manner and for such purpose only as shall be necessary for the construction and convenient operation of said railroad, telegraph, and telephone line, and when any portion thereof shall cease to be used, such portion shall revert to said nation or tribe of Indians from which the same shall have been taken."
 
 
 5
 By the Act of March 3, 1899, 30 Stat. 1368, the predecessor of the Fort Smith Railway Company was "invested and empowered with the right of locating, constructing, owning, equipping, operating, using, and maintaining a railway and telegraph and telephone line through the Choctaw and Creek nations, in the Indian Territory, * * *."
 
 
 6
 The pertinent parts of Sec. 2 of such Act read as follows:
 
 
 7
 "SEC. 2. That said corporation is authorized to take and use for all purposes of a railway and telegraph and telephone line, and for no other purpose, a right of way one hundred feet in width through the said Choctaw and Creek nations * * * Provided further, That no part of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used except in such manner and for such purposes only as shall be necessary for the construction and convenient operation of said railroad, telegraph, and telephone lines, and when any portion thereof shall cease to be so used, such portion shall revert to the Choctaw Nation or Creek Nation."
 
 
 8
 By the Act of April 26, 1906, 34 Stat. 137, the railroad companies which had acquired railroad rights of way through the Indian Territory were authorized to acquire the fee titles to the lands over which they had rights of way, under rules and regulations to be prescribed by the Secretary of the Interior, at a valuation to be determined by him, but such Act provided that if the railroad companies failed to make payment of the amount so fixed within the time prescribed in the regulations, title thereto "shall thereupon vest in the owner of the legal subdivision" adjoining such rights of way.[4]
 
 
 9
 It will be observed that in the Act of April 26, 1906, Congress characterizes a railroad right of way as "in the nature of an easement."
 
 
 10
 These cases, which were consolidated for trial, had their genesis when the Gas Company constructed 12 gas pipelines under the Railway Companies' rights of way.
 
 
 11
 The Gas Company brought a state court condemnation proceeding against each of the Railway Companies to acquire the right to lay 12 gas pipelines under the rights of way of the Railway Companies, but below any part of the rights of way being used for railroad purposes.
 
 
 12
 Estimated compensation was deposited by the Gas Company in each of the state court condemnation proceedings, and it obtained orders of possession pursuant to which the 12 gas pipelines were constructed. The Railway Companies did not accept such deposits and the Gas Company withdrew them and dismissed the condemnation proceedings without prejudice.
 
 
 13
 Prior to boring the holes for the gas pipelines, the Gas Company had paid the owners of the servient estates an agreed amount for the right to install gas pipelines underneath the rights of way of Railway Companies.
 
 
 14
 After it had installed the 12 gas pipelines under the Railway Companies' rights of way and had dismissed its condemnation proceedings, the Gas Company later installed two larger gas pipelines thereunder.
 
 
 15
 The standard practice where gas pipelines are laid under a railroad right of way is to dig an open ditch on each side of the right of way, to, but not into the right of way, and then bore a hole under the right of way and beneath any construction or use made of it by the railroad company, from one ditch to the other. That practice was followed with respect to the first gas pipelines constructed under the Railway Companies' rights of way. However, each of the other two crossings was for larger pipelines and open trenches were dug on the rights of way, and the pipelines laid beneath the surface of the rights of way and beneath any subsurface construction or any use made of the rights of way by the Railway Companies, and were both backfilled. The entrance of the Gas Company onto the surface of the rights of way was of short duration and did not interfere in any way with the use by the Railway Companies of their respective rights of way.
 
 
 16
 The court found that the installation of the gas pipelines did not interfere in anywise with the Railway Companies' construction, operation, maintenance or use of their respective railroads, telegraph and telephone lines, cuts, fills, and other structures. That finding is amply supported by the evidence and is not clearly erroneous.
 
 
 17
 The gas pipelines might have interfered if they had been installed under tracks, in cuts, but that would be such an entirely impractical place to install a gas pipeline that we may assume that none of the pipelines here involved were installed under tracks, in cuts, of the Railway Companies.
 
 
 18
 In the Southern Railway Company's action against the Gas Company, the Railway Company alleged in its first cause of action that it had the right to the exclusive possession and occupancy of the 100-foot right of way strip; that without authority, permission or license so to do, the Gas Company in three separate locations dug, excavated and constructed its gas pipelines "over, across and under" the Railway Company's right of way, and caused the Railway Company damages in the amount of $7,500; and that the Railway Company was entitled to triple that amount by reason of the Gas Company's wilful trespass.
 
 
 19
 In its second cause of action, the Southern Railway Company sought punitive damages in the amount of $15,000, by reason of the Gas Company's alleged intentional, wilful, oppressive, fraudulent and malicious trespass; and in its third cause of action it sought recovery of $7,500, because of the additional expense it had to incur to make proper inspection of the gas pipelines.
 
 
 20
 In its complaint against the Gas Company, the Fort Smith Railway Company made substantially the same allegations in its three causes of action, and sought to recover the same relief as the Southern Railway Company did in its action against the Gas Company.
 
 
 21
 The Railway Companies rely strongly on the language of the United States Supreme Court in its opinion in Western Union Telegraph Co. v. Pennsylvania Railroad Co., 195 U.S. 540, 570, 25 S.Ct. 133, 141, 49 L.Ed. 312, reading:
 
 
 22
 "* * * A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement. We discussed its character in New Mexico v. United States Trust Co., 172 U.S. 171 [19 S.Ct. 128, 43 L.Ed. 407]. We there said (p. 183, 19 S.Ct. 128) that if a railroad's right of way was an easement it was 'one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property.' * * *
 
 
 23
 "A railroad's right of way has, therefore, the substantiality of the fee, and it is private property, even to the public, in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or in part except upon the payment of compensation. In other words, it is entitled to the protection of the Constituion, and in the precise manner in which protection is given. It can only be taken by the exercise of the powers of eminent domain, * * *."
 
 
 24
 They also rely on Midland Valley R. Co. v. Sutter, 8 Cir., 28 F.2d 163, 165, and particularly that part reading:
 
 
 25
 "* * * The decisions of the national courts and of a majority of the state jurisdictions, however, are to the effect that the railroad company is entitled to the exclusive use and possession of its right of way, and that the owner of the servient estate has no right to occupy the surface of the land conveyed for right of way, in any mode, or for any purpose, without the railroad company's consent. * * *"
 
 
 26
 It should be noted that the opinion in Midland Valley states that "the owner of the servient estate has no right to occupy the surface of the land conveyed for right of way" (italics ours); and that neither of the opinions in such cases passed on the question of the right of the owner of the servient estate to occupy and use the strata of the land conveyed for the right of way, which is below the surface of such land, and also below any of the strata below such surface, used or needed by the railroad company in the construction, maintenance or operation of its railroad; and also where such occupancy and use by the owner of the servient estate will not in anywise interfere with nor in any manner affect the construction, maintenance or operation of its railroad by the railroad company.
 
 
 27
 Moreover, the opinions in such two cases relied on by the Railway Companies should be read and considered in the light of the particular facts therein involved. That is particularly true here, because such facts differ so materially from the facts involved in the instant cases.
 
 
 28
 In each of such cases there was invasion of the surface of the railroad's right of way, and also of strata below the surface, used and needed by the railroad company in the construction, maintenance and operation of its railroad.
 
 
 29
 In the first case, Western Union went upon the surface of the land covered by the railroad's right of way and erected poles, the lower ends of which were sunk into the ground below the surface, as also were stays for guide wires attached to the poles. It attached to the poles wires over which it sent telegraph messages, and it had to occupy the surface from time to time to repair and maintain such structures and wires.
 
 
 30
 In the second case, the court enjoined the defendant, an oil and gas lessee, from entering on the railroad's right of way and conducting drilling operations for the discovery of oil and gas and the production thereof, if found in paying quantities. It is clear that for the oil lessee to have conducted such drilling operations, it would have had to enter upon the surface of the land covered by the railroad's right of way, erect drilling derricks, power plants, sumps for the deposit of material brought up by the drill or pumped up from the drill hole, and to continuously occupy such surface. It is apparent that the drill hole would pass from the surface down through the subsurface strata, a portion of which the railroad company would need for making fills, in constructing drainage ditches, in installing culverts, building bridges and other structures, and installing supports therefor beneath the surface of the land covered by the right of way.
 
 
 31
 On the other hand, in the instant cases there was no invasion of the surface, except to dig the trenches in which the two larger gas pipelines were laid, lay the same, and backfill the trenches. Such invasion was temporary and of short duration, and did not in any way affect the subsurface strata which the Railway Companies used in the construction, maintenance and operation of their railways. The trial court found, and we agree, that the gas pipelines in no way interfered with the construction, maintenance, operation or use by the Railway Companies, either above or below the surface of the land over which the rights of way were granted.
 
 
 32
 Each of the Acts of Congress granting the rights of way contained the following language:
 
 
 33
 "That no parts [part in Act of March 3, 1899] of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used except in such manner and for such purposes [purpose in Act of February 27, 1893] only as shall be necessary for the construction and convenient operation of said railroad, * * *."
 
 
 34
 And in Sec. 14 of the Act of April 26, 1906, Congress said:
 
 
 35
 "Provided further, That this section shall not apply to land reserved from allotment because of the right of any railroad or railway company therein in the nature of an easement for right of way, depot, station grounds, water stations, stock yards or other uses connected with the maintenance and operation of such company's railroad * * * but if any such company * * * shall cease to use such land for the purpose for which it was reserved, title thereto shall thereupon vest in the owner of the legal subdivision of which the land so abandoned is a part, * * *." (Italics ours.)
 
 
 36
 The foregoing shows that Congress clearly intended that the rights of way granted to railroads and railways through the Indian Territory were to be in the nature of an easement, and that there was both a dominant and a servient estate.
 
 
 37
 Moreover, this court has considered the rights of the owners of servient estates and those claiming under them, as against the rights of railroads, under rights of way through Indian Territory acquired under Acts of Congress not materially different from the Acts of Congress under which the Railway Companies obtained the rights of way involved in the instant cases, and has consistently held that such rights of way are in the nature of an easement and that the servient estate is in the owner of the abutting fee.[5]
 
 
 38
 Finally, counsel for the Railway Companies state in their brief:
 
 
 39
 "The Court correctly ruled that the Railroads owned an easement for railway purposes and that the servient estate under the Railroad right-of-way was owned by the abutting landowners."
 
 They further state in their brief:
 
 40
 "It is conceded by the Railroads that under Sec. 14 of the Act of April 26, 1906, 34 Stat. 137, the abutting landowners owned the servient estate under the Railroads right-of-way."
 
 
 41
 Of course, a railroad company which acquires a right of way over and through lands of another acquires more than the mere right of passage over such lands. It acquires the right to excavate drainage ditches; to construct beneath the surface supports for bridges and other structures; to erect and maintain telegraph lines and supporting poles with part of the poles beneath the surface; to construct passenger and freight depots, using portions of the land below them for foundations; to construct signals; to make fills and cuts to decrease the grades of their rail lines, and to use material from the land covered by the right of way to make such fills; and to construct a roadbed and lay its ties and rails thereon. Hence, it has substantial surface and subsurface rights, which it is entitled to have protected. But in our opinion it cannot deprive the owner of the servient estate or those claiming through such owner from making use of the land in strata below the surface and below substrata which are used or needed by the railroad company, and which in nowise, as in the instant cases, interferes with the construction, maintenance and operation of the railroad.
 
 
 42
 With a minor exception, the trial court found that the Railway Companies were not entitled to recover any damages. It held that because of the construction of the gas pipelines, the Railway Companies had to make changes in their maps at a cost of $50 per pipeline crossing, and awarded damages to the Railway Companies against the Gas Company on that basis. It entered its judgment accordingly.
 
 
 43
 For the reasons indicated above, we conclude that the decision of the trial court was in all respects correct, and it is therefore affirmed.
 
 
 
 [1]
 Hereinafter referred to as the Southern Railway Company
 
 
 [2]
 Hereinafter referred to as the Fort Smith Railway Company
 
 
 [3]
 Hereinafter referred to as the Gas Company
 
 
 [4]
 Section 14 of the Act of April 26, 1906, in part reads:
 "* * * Provided further, That this section shall not apply to land reserved from allotment because of the right of any railroad or railway company therein in the nature of an easement for right of way, depot, station grounds, water stations, stock yards or other uses connected with the maintenance and operation of such company's railroad, title to which tracts may be acquired by the railroad or railway company under rules and regulations to be prescribed by the Secretary of the Interior at a valuation to be determined by him; but if any such company shall fail to make payment within the time prescribed by the regulations or shall cease to use such land for the purpose for which it was reserved, title thereto shall thereupon vest in the owner of the legal subdivision of which the land so abandoned is a part, except lands within a municipality the title to which, upon abandonment, shall vest in such municipality." (Italics ours.)
 
 
 [5]
 See St. Louis-San Francisco Railway Co. v. Town of Francis, 10 Cir., 249 F.2d 546, 547-548, and cases therein cited on page 548