**TUTHILL RANCH, INC.,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5085.

United States Court of Appeals,
Federal Circuit.

DECIDED: Aug. 23, 2004.

puted material facts could establish a physical taking, we affirm.

## BACKGROUND

The Bonneville Power Administration ("BPA"), an agency of the federal government, transmits electrical power along approximately 15,000 miles of power lines in Oregon, Washington, Idaho, and Montana. One of these power lines crosses Tuthill's property in Washington. In 1953, Tuthill's predecessor-in-interest sold the BPA "a perpetual easement and right to enter and erect, operate, maintain, repair, rebuild, and patrol one or more electrical power transmission lines and appurtenant signal lines, poles, towers, wires, cables, and appliances necessary in connection therewith."

The BPA then built both power lines and accompanying communication, or signal lines in accordance with the terms of its easement. Beginning in the 1950s, the BPA upgraded its signal line technology on a number of occasions. In the most recent of these technological upgrades, the BPA decided to convert all of its signal lines to fiber optic cables.

The upgrade to fiber optics began in 1995. According to the government, BPA devised its upgrade plan based "upon planned load growth and wholesale transmission transactions between now and 2025." In most places, the BPA standardized its cables to either the 36- or the 72- fiber size to accommodate a claimed projected need of sixteen fibers by 2008, sixty-four by 2018, and seventy-six by 2025. It is therefore undisputed that the BPA installed more capacity than it requires for its current needs but that the BPA may need this capacity to meet its projected future needs. It is also undisputed that the BPA now leases some of this excess capacity to unrelated third parties. The BPA currently needs only a fraction of the

Michael G. Neff, Haglund, Kelley, Horngren & Jones, LLP, of Portland, OR, argued for plaintiff-appellant. Of counsel was Scott W. Horngren.

Andrew W. Mergen, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Thomas L. Sansonetti, Assistant Attorney General; and Julia K. Evans, William B. Lazarus, and Lisa E. Jones, Attorneys. Of counsel was Sonya L. Baskerville, Attorney, Bonneville Power Administration, of Portland, OR.

Before MAYER, Chief Judge, LOURIE, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

Tuthill Ranch, Inc. ("Tuthill") appeals the summary judgment granted by the United States Court of Federal Claims ("Court of Federal Claims") in favor of the United States ("government"). Tuthill claimed that the government had physically occupied Tuthill's property, thereby effecting a compensable physical taking. The Court of Federal Claims found that, based upon undisputed facts, the government had not physically occupied Tuthill's property, and was therefore not liable for a physical taking. Based upon this finding, the Court of Federal Claims denied Tuthill's motion for summary judgment and granted the government's motion for summary judgment. *Tuthill v. United States*, No. 00–635L, (Fed.Cl. Mar. 17, 2003). Because the Court of Federal Claims correctly determined that no dis-

thirty-six fibers crossing Tuthill's property to maintain the power lines. It leases the remainder to a telecommunications company.

Tuthill alleges that the "creation of a fiber optic communication system many times greater than is needed by the agency to serve its energy control needs, coupled with [the government's] leasing and other contractual agreements with for-profit communications companies, is use outside of the scope of the easement [that the government] relies on to burden [Tuthill's] real property." Given this alleged breach of the easement's explicit terms, Tuthill further asserts that the government's "misuse of these easements, and or [the government's] allowing of others to misuse these easements, amounts to a physical occupation of [Tuthill's] real property which is a per se taking without just compensation prohibited by the Fifth Amendment to the Constitution." Finally, Tuthill claims that the government owes it just compensation for the permanent physical taking of its property—or in the alternative, if the government chooses to cease the occupation, just compensation for the temporary physical taking of its property. Tuthill has not brought any other causes of action or theories upon which the government allegedly caused compensable damage to Tuthill's property. Tuthill's entire case therefore rests upon whether or not the government's actions constituted a per se physical taking.

The government contends that the BPA designed this natural upgrade to its infrastructure to accommodate growth projected through 2025. Those projections determined the number of fibers, and thus the size of the cables, laid as necessary "signal lines" per the easement's terms. Once the BPA laid those cables, leasing unused fibers to third parties did not constitute a physical invasion, and did not increase the burden on the servient estate in any way. Therefore, according to the government, "[Tuthill's] property has not been burdened in any way for which it has not been compensated already," that is in 1953.

Tuthill and the government filed cross motions for summary judgment. Based upon undisputed facts, the Court of Federal Claims explained that

[t]he scope of the easement is not relevant in this court because it cannot give rise to a physical taking. Moreover, [Tuthill] has not identified a property interest that could have been taken. Tuthill may have avenues of relief in federal court, but not on a takings theory. For example, misuse of an easement may be a trespass to real property.

The government overbuilt the communication network to accommodate future growth. What is excess capacity today may or may not be excess in the future. The easement allows "appurtenant signal lines ... necessary and in connection therewith...." Physical presence of the fiber optic cable over the easement is not a taking. No additional physical intrusion to [Tuthill's] land has resulted from the lease to the third parties.

*Tuthill,* slip op. at 6. The Court of Federal Claims therefore denied Tuthill's motion and granted summary judgment in favor of the government. Tuthill timely appealed.

### DISCUSSION

▮ We have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(3). We review the Court of Federal Claims' grant of summary judgment without deference. *Christopher Vill., L.P. v. United States,* 360 F.3d 1319, 1326 (Fed.Cir.2004); *Agwiak v. United States,* 347 F.3d 1375, 1377 (Fed.Cir.2003); *Scott Timber Co. v. United States,* 333 F.3d 1358, 1365 (Fed.Cir.2003). Summary judgment is appropriate when there are no disputed issues of material

fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ This case involves Fifth Amendment takings jurisprudence. "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Brown v. Legal Found. of Wash.,* 538 U.S. 216, 235, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003). Tuthill asserts that the federal government, acting through the BPA, physically occupied its property without just compensation.

■ The Supreme Court has recognized that the government may "take" private property by either physical occupation or regulation, and that these two categories of takings are subject to different analyses. *See Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

The text of the Fifth Amendment itself provides a basis for drawing a distinction between physical takings and regulatory takings. Its plain language requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation .... When the government *physically takes possession* of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. Similarly, when the government appropriates part of a rooftop in

order to provide cable TV access for apartment tenants, or when its planes use private airspace to approach a government airport, it is required to pay for that share no matter how small.

*Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321–22, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (citations omitted) (emphasis added).

We must therefore begin our analysis, as did the Court of Federal Claims, by considering whether or not the government took physical possession of Tuthill's property. If we find a physical taking, we must vacate the summary judgment and remand the matter to the Court of Federal Claims to construe the easement and to determine damages. If we do not find a physical taking, we must join the Court of Federal Claims in concluding that "the scope of the easement is not relevant," *Tuthill,* slip. op. at 5, and affirm the summary judgment.

The essence of Tuthill's argument on appeal is that the BPA, "by deliberately engaging in the overbuilding of its fiber optic system for the purpose of entering communication leases, and by entering those communication leases, has exceeded the scope of its easement rights." According to Tuthill's characterization of the law, "a physical invasion can occur when conditional permissive use of another's property exceeds the conditions under which permission to use was obtained." Tuthill describes this sort of invasion as "a *Loretto*-type physical taking," and premises its entire argument on the government's permanent physical occupation of its property.

Tuthill correctly points to *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), to guide our analysis of physical takings law. In *Loretto,* the Supreme Court held that "a minor but permanent

physical occupation of an owner's property authorized by government constitutes a 'taking' of property for which just compensation is due under the Fifth and Fourteenth Amendments of the Constitution." *Id.* at 421, 102 S.Ct. 3164. Beyond this basic holding, however, the Supreme Court also provided a detailed review of the history of physical takings. This historical review is critical to resolving the present dispute, because the question here is not whether Tuthill is due compensation for the government's physical taking, but rather whether the government's actions constitute a physical taking at all.

In *Loretto*, a New York state law permitted the defendant cable company to install cables and a cable box on Loretto's apartment building. Though the physical dimensions of the "occupation" were small, they were also definite; cables and cable boxes occupy physical space. The Supreme Court ruled that no de minimis exception could apply to the constitutional takings doctrine, and that a small physical occupation was nevertheless a physical occupation. *Id.* Because the State had facilitated the occupation through its own laws, the State was liable for a taking (albeit under the Fourteenth Amendment, rather than the Fifth), and Loretto was due just compensation. *Id.* at 441, 102 S.Ct. 3164.

■ In concluding "that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve," *id.* at 426, 102 S.Ct. 3164, the Supreme Court compared the facts that *Loretto* presented to those that arose in several earlier takings cases. The Court first differentiated regulatory takings, of the type detailed in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 127–28, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), from physical takings, of the type that Loretto presented—and that Tuthill claims to be present

here. *See Loretto,* 458 U.S. at 426, 102 S.Ct. 3164. The *Penn Central* factors critical to determining which regulatory actions constitute regulatory takings are simply inapplicable when analyzing a physical taking; the sole question governing physical takings is whether or not the government has physically occupied the plaintiff's property. *Id.* at 438, 102 S.Ct. 3164.

The *Loretto* Court began its historical review of physical takings cases with *Pumpelly v. Green Bay Co.,* 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1871), and *Northern Transportation Co. v. Chicago,* 99 U.S. 635, 25 L.Ed. 336 (1878). These two cases established the importance of physical occupations and practical ousters to takings law. Both cases involved the government's construction of dams—but only one constituted a taking. In *Pumpelly,* the dam caused permanent flooding of the plaintiff's property—thereby effecting a taking. *Pumpelly,* 80 U.S. (13 Wall.) at 181. In *Northern Transportation,* a temporary dam built pending the completion of a tunnel that was also under construction denied the plaintiffs access to their property and consequently impaired their use of that property. *Northern Transportation,* 99 U.S. at 642. The absence of even a minor physical occupation led the Court to rule that no taking had occurred. *Id.* Numerous flooding cases followed, and the Court uniformly distinguished between those involving a permanent physical occupation, on the one hand, and those involving a more temporary invasion, or a government action outside the owner's property that causes consequential damages within, on the other. *See Loretto,* 458 U.S. at 429, 102 S.Ct. 3164 (citing *United States v. Lynah,* 188 U.S. 445, 468–70, 23 S.Ct. 349, 47 L.Ed. 539 (1903); *Bedford v. United States,* 192 U.S. 217, 225, 24 S.Ct. 238, 48 L.Ed. 414 (1904); *United States v. Cress,* 243 U.S. 316, 327–

28, 37 S.Ct. 380, 61 L.Ed. 746 (1917); *San-guinetti v. United States*, 264 U.S. 146, 149, 44 S.Ct. 264, 68 L.Ed. 608 (1924); *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 809–10, 70 S.Ct. 885, 94 L.Ed. 1277 (1950)).

■ The Supreme Court's development of its physical takings doctrine applied a similar set of rules to cases involving telephone and telegraph wires. *See Loretto*, 458 U.S. at 429–31, 102 S.Ct. 3164. In *St. Louis v. Western Union Telegraph Co.*, 148 U.S. 92, 13 S.Ct. 485, 37 L.Ed. 380 (1893), the Court held that the city of St. Louis could exact reasonable compensation for a telegraph company's placement of telegraph poles on the city's public streets. In *Western Union Telegraph Co. v. Pennsylvania Railroad Co.*, 195 U.S. 540, 25 S.Ct. 133, 49 L.Ed. 312 (1904) the Court assumed that when a telegraph company, acting pursuant to a federal law, constructed and operated telegraph lines over a railroad's right of way the occupation by those telephone lines would be a compensable taking.

> Later cases, relying on the character of a physical occupation, clearly establish that permanent occupations of land by such installations as telegraph and telephone lines, rails, and underground pipes or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land.

*Loretto*, 458 U.S. at 430, 102 S.Ct. 3164. "More recent cases confirm the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property." *Id.* Only the first category—a permanent physical occupation—qualifies as a physical taking of the sort that Tuthill alleges here. *See id.* at 430–32, 102 S.Ct. 3164. Physical invasions short of an occupation and regulations that merely restrict the use of property may qualify as regulatory takings, but not as physical takings. *See id.* The Court described its recent cases as having emphasized the central role that an actual physical occupation plays in determining whether or not a physical taking had occurred. *Id.* at 432.

Perhaps the case whose facts come closest to the type of taking that Tuthill alleges is *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), where the government's imposition of a navigational servitude requiring public access to a pond was a taking because the servitude "took" the pond owner's right to exclude the public. *Id.* at 176, 100 S.Ct. 383. The Court was careful to explain, however, that the government's imposition of this servitude would allow third-party members of the public to invade and to occupy the pond—thereby effecting the requisite physical occupation. "And even if the Government *physically invades* only an easement in property, it must nonetheless pay just compensation." *Id.* at 180, 100 S.Ct. 383 (emphasis added).

Of particular relevance to Tuthill's claim that the BPA's actions constituted a per se physical taking, the *Loretto* Court explained that "[a]lthough the easement of passage, not being a permanent occupation of land, was not considered a taking per se, *Kaiser Aetna* reemphasizes that a physical invasion is a government intrusion of an unusually serious character." *Loretto*, 458 U.S. at 433, 102 S.Ct. 3164.

Our own explanation of *Loretto* and the scope of permissible "*Loretto*-type takings claims" is similarly relevant to determining the viability of Tuthill's claims.

> The holding of Loretto is quite narrow. It applies only to permanent physical occupations either by the government or by a third party acting under govern-

ment authority. A physical occupation, as defined by the Court, is a permanent and exclusive occupation by the government that destroys the owners right to possession, use, and disposal of the property. The Court defined the destruction of these interests as follows: (1) possession, "the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space;" (2) use, "the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others, but can make no nonpossessory use of the property;" and (3) disposal, "even though the owner may retain the bare legal right to dispose of the occupied space ..., the permanent occupation of that space ... will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property."

*Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1353 (Fed.Cir.2002).

 Taken together, *Loretto*'s characterization of *Kaiser Aetna* as failing to identify a per se taking, and our interpretation that *Loretto* itself applies only in the presence of an actual physical occupation, point to the fatal flaw in Tuthill's claim. In answering the government's interrogatories, Tuthill conceded that there would be no taking if either the BPA were using all of the fibers that it laid or the BPA laid fibers only for its own use and did not lease unused fibers to third parties. In other words, Tuthill concedes that the cable itself, which occupies physical space, is

not the source of its complaint. Tuthill alleges that the government's *use* of the fibers within that cable constitutes a per se physical occupation of its property while nevertheless conceding that it has received full compensation for the physical space that the cables presently occupy.[1]

We recently considered a facially similar fact pattern in *Toews v. United States,* 376 F.3d 1371 (Fed.Cir.2004). There, a railroad company acquired an easement to operate a rail line from the Toews's predecessors-in-interest in 1891. More than a century later, the rail line's owner determined to cease operating as a railroad, and converted its right of way to a public recreational trail under the authority of federal legislation. *Id.* 1372–76. The Toews sued, asserting that this change in use violated the terms of the easement, and therefore constituted a taking. The district court agreed and granted summary judgment favoring the Toews. We affirmed. *Id.* at 1373–74. Despite the superficial similarity between these cases, the claims proceeded under very different theories. The easement in *Toews* included an explicit reversion: "Provided, however, that if said Railroad Company shall permanently discontinue the use of said railroad the land and Rights of Way shall at once revert to the undersigned." *Id.* at 1374–75. As a result, the moment that the rail company determined to cease operating the railroad, all rights reverted to the Toews. The subsequent decision to use the previous right of way as a public trail represented a reoccupation, and therefore a physical taking. *Id.* at 1372–75.

---

1. The parties agree that the fiber optic system falls within the terms of the easement. The present dispute is solely about the size of the necessary lines. The dissent concludes that the BPA laid larger cables than were necessary because of an Audit Report rejecting BPA's original argument that it needed to lay

72–fiber cables; only 36–fiber cables traverse Tuthill's property. Moreover, Tuthill has proffered no evidence that the fiber optic cable currently on its property is larger than the original signal lines laid per the easement's original grant.

Here, Tuthill can make no such claim because there is no change of use and no expansion of the easement. The optical fiber signal lines, as installed, are within the terms of the original easement. The BPA has possessed the unquestioned right to lay necessary signal lines since 1953. Tuthill has pled only that the BPA's use of these lines in a manner allegedly inconsistent with the easement constitutes a physical taking, despite already having received full compensation for the physical space that the cables occupy. Unlike the Toews, Tuthill cannot possibly overcome the Court of Federal Claims' conclusion that "leasing fiber strands to third parties does not increase the burden on the servient estate." *Tuthill,* slip. op. at 3. The easement explicitly allowed the BPA to install signal lines necessary to its power transmission lines. The quantum of physical space required to house those signal lines is determined by the BPA's projections of peak need throughout the projected lifetime of the signal lines. The BPA's installation of the fiber optic cables was certainly a physical invasion, but one for which Tuthill's predecessor-in-interest received full, and therefore just, compensation in 1953. The easement is silent on permissible uses of excess communication capacity during periods at which the BPA's needs fall below its projected peak.

The construction of the easement to determine whether or not the BPA is permitted to sell this excess capacity to third parties capable of using it productively, or is required to keep all unused capacity idle pending Tuthill's permission, is not before us. The only claim that Tuthill raised in the Court of Federal Claims, and thus the only question before this court on appeal, is whether or not the government physically occupied Tuthill's property without just compensation. It did not. Tuthill's predecessor in interest already received just compensation for the entire physical occu-

pation. Tuthill's allegations against the government focus entirely on the *use* of the cables, not on the cables themselves. The Court of Federal Claims was therefore correct in concluding that no physical taking occurred, and that the specifics of the easement were not relevant to Tuthill's allegations of a physical taking.

## CONCLUSION

The Court of Federal Claims correctly determined that the government had already compensated Tuthill fully for the physical occupation of Tuthill's property. The grant of summary judgment in favor of the government on Tuthill's claim of a physical taking is therefore

*AFFIRMED.*

## COSTS

No costs.

MAYER, Chief Judge, dissenting.

I dissent because the objective evidence shows that Bonneville Power Authority (BPA) installed fiber optic cable with excess fibers which exceeded operational needs, mainly because it wanted to generate revenue by leasing the excess to telecommunications providers. The installation of a thirty-six fiber cable across the Tuthill Ranch (Tuthill) was not "necessary in connection" to maintaining the electrical power transmission lines. Therefore, this installation is outside the scope of the easement and is a taking compensable under the Fifth Amendment because BPA has permanently occupied physical space and deprived Tuthill of the right to exclude others.

Contrary to the court, the proper course is first to construe the easement to determine whether the challenged activity is within its bounds. *See Toews v. United States,* 376 F.3d 1371 (Fed.Cir.2004). If

BPA's activity is within the scope of the easement, the takings analysis ends. If, however, its activities exceed the easement in a manner not contemplated by the parties, and BPA has physically occupied Tuthill's property, a takings claim exists. When evaluating a takings claim the court first "determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a stick in the bundle of property rights. If so, the court proceeds to the second step, determining whether the governmental action at issue constituted a taking of that stick." *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.2002) (internal citations and quotations omitted).

We construe the scope of an easement from the parties' intent, which we ascertain from the relevant instruments and the objective circumstances to which they refer. *See Sunnyside Valley Irrigation Dist. v. Dickie,* 149 Wash.2d 873, 73 P.3d 369, 372 (2003) ("The intent of the original parties to an easement is determined from the deed as a whole. If the plain language is unambiguous, extrinsic evidence will not be considered.") (internal citations omitted). The language of this easement is plain and unambiguous. BPA was granted the "right to enter and erect, operate, maintain, repair, rebuild, and patrol one or more electrical power transmission lines and *appurtenant signal lines,* poles, towers, *wires, cables,* and appliances *necessary in connection therewith.*" (emphases added). The word "necessary" serves to limit the types of "appurtenant signal lines," wires, and cables that BPA has a right to. Only those "appurtenant signal lines" that are required or indispensable to the building, operation and maintenance of the electrical power transmission lines are covered.

Both parties agree that upgrading to a fiber optic transmission system falls within the terms of the easement. *See Sunnyside Valley,* 73 P.3d at 374 ("[A]n easement can be expanded over time if the express terms of the easement manifest a clear intention by the original parties to modify the initial scope based on future demands."). Tuthill has conceded that the installation of fiber optic cable with excess fibers would also fall under the terms of the easement if the excess fibers were needed for future electrical power transmission use. But the easement does not permit BPA to overbuild its fiber systems so that the excess can be leased to commercial interests.

In October 2001, the United States Department of Energy (DOE) Office of Inspector General's Office of Audit Services released an investigative report entitled "Power Marketing Administrations Installation of Fiber Optics" (Audit Report). The Audit Report noted that Power Marketing Administrations (PMAs) were installing between 12 and 72 fibers per cable and "[s]ince the number of fibers varied widely, the object of [the] audit was to determine if the PMAs were installing fiber optic cable with excess fibers." According to the Audit Report, BPA was installing cable with 36 and 72 fibers. The cable in dispute crossing the Tuthill Ranch contains 36 fibers with a significant number of them leased to a telecommunications company.

BPA claimed that cable with 36 or more fibers was needed to meet upcoming demands through the year 2025, to improve reliability, to provide needed redundancy and to support critical systems. But the Audit Report concluded that BPA had no convincing evidence to support this claim. The Inspector General's "analysis of the material prepared by [BPA] showed that its rationale for its high-fiber count cable

was questionable." The Audit Report concluded that BPA was installing fiber optic cable with excessive fibers which exceeded its operational needs as well as the operational needs of utilities with similar requirements. It said,

The principal reason Bonneville was installing cable with excess fibers was because other factors, such as revenue generation and local economic development, were considered instead of limiting the number of fibers to operational needs. Bonneville contended that it needed 72–fiber cable to meet its operational needs. Documents such as its 1986 Study of Fiber Optic Systems; its 1991 Fiber Optic Decision Paper; its 1995 Business Plan; and other documents, however, focused on the use of fiber optic communications as a means to increase revenues. Further, internal capital construction project reviews conducted from 1998 to 2000 showed that Bonneville considered aiding local economic development and interest by other parties in leasing fibers. Thus, it was clear that leasing played a significant part in Bonneville's decision to acquire larger capacity cable with more fibers than necessary.

The Audit Report also provides an analysis of whether the excess fibers installed by BPA are needed for future use. The Report determined that it could not foresee any circumstance through the year 2025, where more than a 24–fiber cable would be required to meet operational needs. In fact, the Report looked at over 20 utilities similarly situated and found that none were installing more than 24 fibers for operational needs. The objective evidence leads to but one conclusion, BPA has deliberately installed more fibers than needed for use in connection with electrical power transmission so it can commercialize them, a use which is not within the scope of the easement.

Since BPA's activities are not within the scope of the easement, we next examine whether a compensable taking exists. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). I disagree with the court's belief that because the fiber optic lines are run within a cable and Tuthill has already been paid for the physical space that the cable occupies, there can be no taking. The court incorrectly presumes that cables with 12–24 fibers are the same size as a cable carrying a 36–fiber bundle. But cable size is inconsequential because regardless of whether the excess fibers occupy space within a cable covered under the easement or whether they are run outside, a distinct occupation of physical space has occurred that is compensable. Physical intrusion upon property by "wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." *Loretto*, 458 U.S. at 430, 102 S.Ct. 3164. Conversion of appurtenant signal lines necessary to maintaining electrical power transmission lines into commercial telecommunications systems is a new easement, not encompassed by the original one. *See Toews*, 376 F.3d at 1376–77 ("The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject.").

In stating that "Tuthill conceded that there would be no taking if either the BPA were using all of the fibers that it laid or the BPA laid fibers only for its own use and did not lease unused fibers to third parties," *ante* at 1138, the court misconstrues Tuthill's position. In an interrogatory response asking "[i]f BPA was using only a portion of the optic fibers within the cable that runs across your property for BPA's energy control needs and not leas-

ing any of the excess fiber to third parties, is it your contention in this lawsuit that the presence of the excess fiber would constitute a taking of your property without just compensation?" Tuthill responded by declaring that "[i]f the purpose of the line was to use the excess fiber in the future only for BPA's energy control needs, then the fiber would not constitute a taking." In that situation, of course there would be no taking because the additional occupied space, regardless of location, is expressly covered by the easement. By failing to first construe the scope of the easement, the court misses the point. It says that BPA's installation of the fiber optic cables was certainly a physical invasion, but one for which Tuthill received full compensation in 1953. But the fact that Tuthill has received full compensation for the space the cable occupies is not pertinent because the additional space occupied by the excess fibers, no matter how small, is outside the scope of the easement and must be considered apart from the area occupied by the original wires and cables. And whether or not the burden on the servient estate has increased is irrelevant. *See Loretto,* 458 U.S. at 430, 102 S.Ct. 3164.